Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1699
kwieneke@swlfirm.com
cretts@swlfirm.com

Attorneys for Defendants City of Phoenix,
Matthew Johnson, Celina Gonzales, Joel
Zemaitis and William Weber

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ngozi Mbegbu, individually as the surviving spouse of decedent Balantine Mbegbu and on behalf of decedent's children Ogechukwu Amarachukwu Gloria Mbegbu and C.C.E.M. (a minor) as the statutory beneficiaries of Balantine Mbegbu; and as Personal Representative of the Estate of Balantine Mbegbu, | NO. 2:16-cv-00424-DGC |
| | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Defendants City of Phoenix ("the City") and Officers Matthew Johnson, Celina Gonzales, Joel Zemaitis, and William Weber ("the Officers), collectively "Defendants," move for summary judgment dismissing Plaintiffs' claims: (1) under 42 U.S.C. § 1983 for excessive force (Count II) and loss of familial association (Count III); (2) under Arizona law for wrongful death (Count I); and (3) for punitive damages. Insufficient evidence supports these claims, and the Officers are entitled to qualified immunity.

## I.    BACKGROUND

1.    On October 6, 2014, at approximately 8:47 p.m., decedent Balantine Mbegbu ("Mbegbu") called his best friend, Geralds, to complain that his wife, Plaintiff

Ngozi Mbegbu ("Ngozi"), had threatened to call the police. (Defendants' Statement of Facts ("DSOF"), ¶ 1.) Mbegbu sounded "very angry and very upset" that Ngozi and their son C.C.E.M. ("the son") were coming home late at night from the wife's social group meetings and the son's basketball practice. (DSOF ¶ 2.) Mbegbu told Geralds that he or his wife would die that day. (DSOF ¶ 3.) Geralds listened for nine minutes as Mbegbu repeated his complaints over and over again. (DSOF ¶ 4.) When the call ended, Geralds called 911 because he was concerned that the fight would get out of hand.[1] (DSOF ¶ 5.)

At approximately 9:11 p.m., Officers Gonzales and Johnson responded to the call and contacted Ngozi standing by the street outside her house. (DSOF ¶ 8.) Ngozi told the Officers she was fine. (DSOF ¶ 9.) After the Officers explained that they received a call from a concerned friend, Ngozi said that she was a law-abiding citizen and appreciated what the Officers do. (DSOF ¶ 10.) She then began telling them about the son, that he plays basketball, and that she needed to go pick him up from the gym. (DSOF ¶ 11.) Ngozi, who is Nigerian and speaks with a heavy accent, said something that suggested she wanted them to follow her, and she led them to the front door of the house. (DSOF ¶ 12.) Ngozi banged on the door, said something in a foreign language, banged on the door again, and opened it. (DSOF ¶ 13.) She invited the Officers inside and began showing them pictures on the wall of her children. (DSOF ¶ 14.)

Mbegbu was sitting in the dining/living room area near a sliding glass door. (DSOF ¶ 15.) When he saw the Officers, he became furious and jumped from his chair, yelling and demanding to know if Ngozi called the police and accusing the Officers of coming to kill him. (DSOF ¶ 16.) On a scale of one to 10, with 10 being the loudest volume, Mbegbu yelled at a "10." (DSOF ¶¶ 17-18.) Officer Johnson tried to calm him down and explain they were not there to kill him and that the wife was just showing them pictures of the children. (DSOF ¶ 19.) Mbegbu approached the Officers standing near the door and came

---

[1] Geralds had known Mbegbu since late 2009 or early 2010, and believed Mbegbu had a "short temper" and "[would get] angry easily." (DSOF ¶¶ 7-8.) Mbegbu's family members also believed that Mbegbu had an anger problem, which the children attributed to a "stress-induced" temper. (DSOF ¶¶ 85-87.)

within six to eight inches of Officer Johnson's face, pointing his index finger at him while yelling at him. (DSOF ¶ 20.) Because he was invading Officer Johnson's personal space, and Officer Johnson felt uncomfortable with his back towards the door and wall, Officer Johnson placed his right hand on Mbegbu's chest and extended his arm to create some space between them. (DSOF ¶ 21.) Because Officer Johnson did not use much force and because Mbegbu was a much larger and heavier man (over 200 pounds) Officer Johnson was only able to move Mbegbu's upper body back slightly. (DSOF ¶ 22.) "[A]mped up," Mbegbu swatted Officer Johnson's arm away, committing aggravated assault on a peace officer. (DSOF ¶ 23.) Given the level of Mbegbu's aggression, Officer Johnson anticipated a physical resistance and believed that he and Officer Gonzales had a considerable size disadvantage. (DSOF ¶ 25-26.) He also believed that it would have been unsafe for Ngozi to leave because Mbegbu might redirect his anger and aggression at her. (DSOF ¶ 27.) The Officers decided to try and verbally persuade him to calm down and to call for backup. (DSOF ¶ 28.) Officer Johnson quietly whispered to Officer Gonzales the plan to arrest Mbegbu. (DSOF ¶ 29.) At 9:17 p.m., Officer Gonzales radioed for backup. (DSFO ¶ 30.)

After approximately two minutes of trying to calm Mbegbu down, he returned to the chair and sat down. (DSOF ¶ 31.) At 9:20 p.m., Officer Zemaitis arrived at the house and heard Mbegbu yelling loudly. (DSOF ¶ 33.) He entered the house and immediately understood, from having previously worked with Officer Johnson and after a brief discussion, that Officer Johnson wanted Mbegbu arrested. (DSOF ¶ 34.) Officers Zemaitis, Johnson, and Gonzales walked over to the chair, and Officer Johnson grabbed Mbegbu's left arm to arrest him. (DSOF ¶ 35.) Mbegbu jerked violently, splashing a cup of hot liquid all over Officers Gonzales and Zemaitis, who stood in front of Mbegbu. (DSOF ¶ 36.) The hot liquid spilled on the floor, making it slippery. (DSOF ¶ 36.)

Mbegbu stood up and tensed his body, flailed his arms around, and fell back into the chair. (DSOF ¶ 37.) Mbegbu then kicked his legs at the Officers to prevent them from arresting him. (DSOF ¶ 38.) Mbegbu kicked Officer Gonzales three times: once on the

right shin and twice on the left shin. (DSOF ¶ 39.) Mbegbu then kicked Officer Zemaitis in his right thigh/groin area. (DSOF ¶ 40.) To stop him, Officer Johnson delivered one closed-fist strike to the side of Mbegbu's face, momentarily dazing him. (DSOF ¶ 41.) Officer Johnson used that opportunity to grab Mbegbu's arm, but he quickly recovered and resumed struggling and resisting arrest. (DSOF ¶ 43.)

Seeing Officer Johnson struggling to restrain Mbegbu's arm, Officer Zemaitis took a couple of steps back, and from a distance of approximately six to eight feet, deployed his X2 Taser in dart mode, aiming at Mbegbu's center mass. (DSOF ¶ 44.) Officer Johnson heard the Taser pop and let go of Mbegbu's arm. (DSOF ¶ 45.) The probes attached to Mbegbu's stomach and Officer Zemaitis delivered an 11-second cycle, but it did not incapacitate Mbegbu. (DSOF ¶ 46.) Mbegbu continued flailing his arms and kicking at the Officers. (DSOF ¶ 48.) Clenching his fists, Mbegbu stood from the chair to his feet and refused commands to get down on the ground. (DSOF ¶ 49.) Officer Zemaitis was unsure whether the Taser connection was active because it apparently had no effect on Mbegbu. (DSOF ¶ 50.) Officer Zemaitis then saw Mbegbu reach for a pitcher on the table next to him and believed that he might throw it at the Officers. (DSOF ¶ 51.) Officer Zemaitis thus delivered a 6-second cycle, and Mbegbu fell to the ground. (DSOF ¶ 52.)

At approximately 9:18 p.m., Officer Weber arrived at the house and heard the sound of the Taser deploy, so he ran inside. (DSOF ¶ 53.) Officer Weber saw Mbegbu fall to the ground (after the second Taser cycle), but immediately try to get back up. (DSOF ¶ 54.) He ran to Mbegbu and grabbed him, turning him and taking him back down to the ground on his stomach. (DSOF ¶ 55.) Officers Johnson tried to grab Mbegbu's left arm, but it was pinned underneath Mbegbu's body as he continued to resist. (DSOF ¶¶ 56-57.) Officer Johnson placed his knee/shin on Mbegbu's head/shoulder/neck area to hold him down as they tried to pull his left arm out from underneath his body to handcuff. (DSOF ¶ 58.) Opposite them, Officer Weber tried to grab Mbegbu's right arm, which was also pinned beneath the body, because Mbegbu refused to comply with orders to put his hands behind his back. (DSOF ¶ 59.) Officer Gonzales helped Officer Johnson handcuff

Mbegbu's left arm, then helped Officer Weber pull the right arm out and link the handcuffs. (DSOF ¶ 60.)

Mbegbu, however, still did not stop resisting and kicked at Officer Zemaitis. (DSOF ¶ 61.) To stop him, Officer Johnson pressed his thumb on a pressure point behind Mbegbu's ear/neck area, but Mbegbu tried to roll over and get up. (DSOF ¶ 62.) Seeing Mbegbu try to roll over and get up again, Officer Weber placed his knee on Mbegbu's back to hold him down. (DSOF ¶¶ 63-64.) Because Mbegbu continued kicking, Officer Zemaitis grabbed Mbegbu's legs, bent them at the knees, and held them down. (DSOF ¶¶ 65-66.)

At 9:21 p.m., Officer Weber cleared the radio and requested a RIPP restraint for the legs. (DSOF ¶ 67.) The Officers then noticed that Mbegbu had stopped moving. (DSOF ¶ 68.) Officer Zemaitis checked Mbegbu's neck and felt a faint pulse. (DSOF ¶ 69.) The Officers rolled Mbegbu to a seated position against Officer Zemaitis' leg, and Mbegbu's head slumped forward. (DSOF ¶ 70.) At 9:23 p.m., Officer O'Neil arrived and saw that Mbegbu had been restrained and sitting up; Mbegbu's eyes were closed, but he was moving slightly. (DSOF ¶ 71.) Officer Pelke also arrived and saw Mbegbu restrained and sitting against Officer Zemaitis legs. (DSOF ¶ 72.) He offered a RIPP restraint, but Officer Zemaitis said it was not necessary. (DSOF ¶ 73.) Officer Pelke then looked at Mbegbu for a few seconds but could not tell whether he was still breathing. (DSOF ¶ 74.) The Officers removed the handcuffs and rolled him onto his back to check for vitals. (DSOF ¶ 75.)

At 9:24 p.m., Officer Weber radioed dispatch to request the fire department paramedics and a supervisor to report the Taser use. (DSOF ¶ 76.) Both Officers Gonzales and Weber saw Mbegbu's stomach move back and forth, and he appeared to be breathing. (DSOF ¶ 77.) Officer Zemaitis believed he felt a pulse, but was not sure whether it was his own adrenaline. (DSOF ¶ 78.) Other officers checked but could not detect breathing. (DSOF ¶ 79.) Officer Zemaitis then cleared Mbegbu's throat and began CPR. (DSOF ¶ 80.) When he was tired, Officer Gonzales took over. (DSOF ¶ 81.) When she was tired,

Officer Johnson took over chest compressions until the fire department arrived. (DSOF ¶ 82.) At 9:29 p.m., the Officers radioed a request for the fire department to "step it up." (DSOF ¶ 83.) When the paramedics arrived, they noted that Mbegbu's heart rate was asystole and took him to the hospital, where he was later pronounced dead. (DSOF ¶ 84.)

*History of Domestic Violence and Anger Problems*. Mbegbu's family members believe that his personality changed and anger issues began, approximately one year before this incident because he was always mad about the son coming home late from basketball practice. (DSOF ¶ 85.) On May 11, 2014, the daughter called 911 because Mbegbu had been fighting with everyone in the house and refused to allow them to leave to drive a visiting aunt home. (DSOF ¶ 88.) Mbegbu complained to the officer that no one in the family respected him, and that, instead of spending all his money, they should show him respect because he owned the house and was in charge. (DSOF ¶ 89.) Mbegbu would not listen to the officer and had to be told a couple of times to sit down and relax. (DSOF ¶ 90.)

On May 13, 2015, the son's high school assistant principal reported to police that Mbegbu had made 15 to 20 harassing phone calls, sounding like an "insane" person and accusing the assistant principal of burning down Mbegbu's house. (DSOF ¶ 91.) He was aware that police had been involved with police for domestic violence issues and wanted the incident reported in case Mbegbu escalated the matter. (DSOF ¶ 92.) Approximately six months before this incident, Mbegbu hit Ngozi when she pleaded with him to not beat up the son for coming back late from the gym. (DSOF ¶ 93.)

*Medical Evidence.* Unknown to the Officers, Mbegbu had numerous medical problems, including diabetes, hypertension, arteriosclerosis, and sickle-cell anemia trait. (DSOF ¶ 94.) The medical examiner concluded that the cause of death was "[c]ardiac arrest in the setting of acute cyclobenzaprine intoxication, multiple medical problems, and law enforcement subdual" and the manner of death was "[u]ndetermined." (DSOF ¶ 95.)

*Dr. Beckson's Forensic Psychiatry Expert Opinions*. Mace Beckson is a Board certified physician in Psychiatry and Forensic Psychiatry. (DSOF ¶ DSOF ¶ 97.)

Dr. Beckson opined that the Officers correctly perceived Mbegbu as a safety threat given the comments he made to Geralds that he or his wife would die that day and his aggressive and combative behavior in interacting with the Officers. (DSOF ¶ 98.)

***Dr. Vilke's Medical Expert Opinions***. The City's medical causation expert, Gary Vilke, is an emergency department physician, independent researcher, and published medical expert in the fields of human physiology and the effects of positional restraints and positional asphyxia, neck holds, Taser electronic control devices (ECDs), and in-custody cardiac arrests and death. (DSOF ¶ 99.) Dr. Vilke opined to a reasonable degree of medical certainty that Mbegbu's sudden cardiac arrest and death were not caused or contributed to by the Officers' conduct. (DSOF ¶ 100.) Dr. Vilke explained that Mbegbu could not have been asphyxiated because: (1) he was taken into custody within 60 to 90 seconds; (2) he continued moving his body, flailing his arms, and kicking to resist arrest, and continued kicking after he was handcuffed, showing that he was breathing; (3) the weight of Officer Johnson's knee on his upper torso during the restraint, Officer Weber's knee on his back to prevent him from rolling over, and Officer Zemaitis' bending Mbegbu's legs at the knees and holding them down—could not have impaired his breathing ability; and (4) Mbegbu continued breathing after he was restrained. (DSOF ¶ 101.)

Dr. Vilke also opined that the Taser did not cause or contribute to Mbegbu's death because none of the five factors that must be present for a Taser charge to possibly cause cardiac arrest and death were not present, and belied by the evidence that Mbegbu did not die instantly but continued to physically struggle with the Officers, and that the paramedics noted an asystole rhythm, not the VF rhythm typical of an electrocution. (DSOF ¶ 102.) Dr. Vilke further opined that the closed-fist strike to Mbegbu's left-side of the face did not cause or contribute to his death because the autopsy results show only superficial laceration and bruising near the forehead/eye area, but no intracranial injuries. (DSOF ¶ 103.) And he found no soft tissue or neck bone injury to medically indicate that a chokehold was used. (DSOF ¶ 104.)

***Dr. Wetli's Pathology Expert Opinions.*** Dr. Charles Wetli is a Board-certified forensic pathologist and member of the National Association of Medical Examiners with extensive independent scientific research experience and publications in the field. (DSOF ¶ 105.) Dr. Wetli opined to a reasonable degree of medical certainty that Mbegbu's death was caused by a combination of: (1) the high level of cyclobenzaprine in the blood which is known to cause agitation and psychosis demonstrated by his aggressive behavior; (2) excited delirium, as demonstrated by that same violent and psychotic behavior and his unexpected strength and intense physical exertion, and by the profound drop in blood pH, sudden loss of vital signs, and a terminal heart rhythm of asystole; and (3) sudden death caused by the sickle cell trait that limited the ability of his red blood cells to carry sufficient oxygen to support his intense physical exertion. (DSOF ¶ 106.) Dr. Wetli further opined that the Officers' conduct could not have caused or contributed to Mbegbu's cardiac arrest and death because: (1) he did not die within 15 seconds after the Taser deployment but continued to physically struggle with the Officers; and (2) the theory of positional asphyxiation by restraint in a prone position has been debunked by recent findings that lying in a prone position actually facilitates breathing. (DSOF ¶ 107.)

***The Officers Used Reasonable Force.*** The Professional Standards Bureau ("PSB") conducted an internal investigation, and the Use of Force Board found that the Officers' use of force was within policy. (DSOF ¶ 108.) The Maricopa County Attorney's Office independently reviewed the incident and found that the Officers did not commit any act warranting criminal prosecution. (DSOF ¶ 109.)

Greg Meyer, a former Los Angeles Police captain and member of its Tactics Training Review Committee, is Defendants' police policy and practices expert. (DSOF ¶ 110.) Meyer explained that: (1) Taser deployment on a resisting suspect typically results in fewer and less injuries to officers and suspects compared to other nonlethal police tools and tactics; (2) it is important for police officers to act quickly to gain compliance to avoid escalation and injuries that tend to result from prolonged struggles; and (3) domestic violence calls are particularly volatile and dangerous situations. (DSOF ¶ 111.)

8

## II.    THE OFFICERS DID NOT USE EXCESSIVE FORCE.

In Count I, Plaintiffs allege excessive force based on: (1) Officer Johnson's use of one closed fist strike and a pressure point behind his ear/neck area; (2) Officer Zemaitis' use of the Taser; (3) the Officers allegedly "slamming" him to the ground and handcuffing him in prone position; and (4) an unknown officer's use of an alleged chokehold.[2] Legally insufficient evidence supports any of these claims.

***Plaintiffs Cannot Establish Medical Causation***. As an initial matter, Plaintiffs do not claim—and no evidence supports—that any force used by the Officers *proximately caused* Mbegbu's cardiac arrest and death. The Ninth Circuit has emphasized: "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 369 (9th Cir. 1998). A "crucial" distinction exists between alleged civil rights violations that cause death and those that do not. *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014). Alleged civil rights violations that do not cause death are subject to the restrictions of the state survival statute. *See id*. The Ninth Circuit recently held that Arizona's survival statute does not permit recover for pre-death pain for excessive force unless it caused the death. *See Fernandez v. Virgillo*, 651 Fed. App'x. 692 (9th Cir. 2016).

Here, there is no unreasonable force attributed to Officer Gonzales, who Ngozi and her sister testified merely touched Mbegbu's hand for five seconds to help him up off the ground. (DSOF ¶ 117.) Thus, Officer Gonzales could not have proximately caused his death. Similarly, there is no evidence—expert or otherwise—that directly connects either Officer Johnson's single fist strike to the side of the head and pressure point behind the ear/neck area to stop Mbegbu from kicking Officer Zemaitis, or his placement of a knee on the head/shoulder/neck area to hold Mbegbu down and pull his arm out for

---

[2] No witness saw or mentioned a chokehold.

handcuffing, to the cardiac arrest and death. For the same reasons, Plaintiffs cannot show that Officer Weber's placement of a knee to prevent Mbegbu from rolling over and getting up, or Officer Zemaitis' use of the Taser twice (once with no apparent effect on Mbegbu), medically caused or contributed to his death.

Indeed, Ngozi and her sister—who were the only two other witnesses—were shown photographs of the Officers, but mostly could not correctly identify who allegedly did what, when, why, or how. (DSOF ¶ 114.) Ngozi could not distinguish between Officers Zemaitis and Weber—who look nothing alike. (DSOF ¶ 115.) Ms. Odom also only remembered Officers Gonzales and Johnson. (DSOF ¶ 116.) At her deposition, Ngozi could not describe the Taser's shape or color, stating that her eyes were full of tears and she was too confused to see anything. (DSOF ¶ 119.) Both Ngozi and Ms. Odom even misidentified Officer Weber (the fourth officer to arrive) as the one who used the Taser, when it was in actuality Officer Zemaitis. (DSOF ¶ 123.) Further, it is undisputed that Ngozi and Ms. Odom stood near the doorway or were outside in the courtyard during the much of the incident after the initial encounter. (DSOF ¶ 124.) Plaintiffs' counsel's mere argument that a factual dispute exists regarding the force used by each officer cannot create a triable issue of fact to defeat summary judgment. And because the jury is not allowed to engage in speculation regarding the force used, let alone the medical cause of death, Plaintiffs have, at most, alleged that the Officers caused Mbegbu pre-death pain and suffering—which are § 1983 claims that abate under Arizona's survival statute. *See Fernandez v. Virgillo*, 2014 WL 2930749, at \*5.

**The Officers' Conduct Was Objectively Reasonable**. Nonetheless, Plaintiffs' excessive force claims fail because the Officers' conduct was objective reasonable under the circumstances.[3] Objective reasonableness is determined by the information the officer

---

[3] Although Plaintiffs claim violations of both the Fourth and Fourteenth Amendments, the Officers' conduct must be analyzed under the Fourth Amendment, "not the more generalized notion of 'substantive due process.'" *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also, e.g., Estate of Lopez ex rel. Lopez v. Torres*, 105 F. Supp. 3d 1148, 1163 (S.D. Cal. 2015) ("Plaintiffs cite no law in support of their effort to restyle their excessive force claim as one substantive due process and the Court finds none.").

on the scene possessed. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001). Courts balance the nature and quality of the intrusion against the government interest at stake, the nature and severity of the crime, the imminent threat of harm to the police or others, and whether the person was actively resisting arrest. *See Graham*, 490 U.S. at 396.

**_Community Caretaker Function/Severity of Crimes._** Where, as here, a police officer is performing a community caretaker function, the government interests in using force to subdue an actively resisting suspect is substantial. *See Ames v. King County, Washington*, 846 F.3d 340, 348 (9th Cir. 2017). Thus, the Ninth Circuit recently explained that the first *Graham* factor should not focus too narrowly on the severity of the crime, but rather on the nature of the ongoing emergency exacerbated by a suspect's resistance. *See Ames*, 846 F.3d at 348.

Here, it is undisputed that the Officers were performing a community caretaker function by responding the a welfare check call by a friend who was concerned that a verbal altercation between Mbegbu and his wife could get out of hand and erupt into physical violence based on threats that Mbegbu made that ominously predicted he or Ngozi would die that day. (DSOF ¶¶ 1-8.) When they entered the house,[4] Mbegbu indeed exploded in anger, yelled loudly, and acted aggressively—first demanding to know if Ngozi called the police and then accusing the Officers of coming to kill him. (DSOF ¶ 16.) Mbegbu—who was a much larger and heavier man—assaulted Officer Johnson by swatting away his hand and continued to yell and act aggressively. (DSOF ¶¶ 16-26.) The officers thus could not leave him alone with Ngozi out of concern he would redirect his anger at her. (DSOF ¶ 27.) These safety concerns were real, given that Mbegbu had hit Ngozi just months before over the same dispute (his anger about his son coming home late for work). (DSOF ¶ 93.)

Nevertheless, the evidence is undisputed that Mbegbu committed serious felonies under Arizona law, including multiple counts of aggravated assault by aggressively

---

[4] A warrant was not necessary because Ngozi invited the Officers in. (DSOF ¶ 14.)

swatting Officer Johnson's hand, kicking Officer Gonzales' shins three times, and kicking Officer Zemaitis in the groin, each act a Class 5 felony. (DSOF ¶¶ 23-24, 39-40.) *See* A.R.S. § 13-1204(A)(8) & (E); *cf. Mattos v. Agarano*, 590 F.3d 1082, 1088 (9th Cir. 2010), *on reh'g en banc,* 661 F.3d 433 (9th Cir. 2011) (wife's interference with the arrest of her belligerent and intoxicated husband "carried the potential for a far more serious crime—assault on an officer."). Mbegbu compounded the severity of those crimes by physically and actively resisting a lawful arrest for aggravated assault, a class 6 felony. (DSOF ¶¶ 35-44, 48-49, 57-66, 113, 122 & 128.) *See* A.R.S. § 13-2508(A), (B).

**Threat to the Officers and Others**. The most important factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet,* 394 F.3d 689, 702 (9th Cir.2005) (en banc). The Ninth Circuit has recognized that "[t]he volatility of situations involving domestic violence" makes them particularly dangerous. *United States v. Martinez,* 406 F.3d 1160, 1164 (9th Cir. 2005). "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (internal quotation marks and citation omitted). Thus, it explained that it has "no trouble concluding" that an officer can reasonably perceive a safety risk, and that those dangers override privacy interests such as "a warrantless entry into a residence for the purpose of intervening in a domestic dispute, protecting the potential victim, and gaining control over a volatile situation that could endanger the officers." *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011). Here, the domestic dispute situation and Mbegbu's violent and aggressive behavior posed a significant safety threat to the Officers and Ngozi, not to mention himself.

**Active Resistance and Attempt to Evade Arrest.** The evidence is undisputed that Mbegbu was actively and aggressively resisting arrest throughout the encounter, starting from the moment he pulled his arm away when Officer Johnson grabbed it, pouring hot liquid all over Officer Zemaitis; when he kicked Officer Gonzales' shins three times and kicked Officer Zemaitis in the groin; when he stood up and refused commands to get back

down after the Taser use; when he tensed his arms and pinned them beneath his body to avoid handcuffing, refusing commands to place his hands behind his back; when he rolled his body to try and stand up again; and when he kicked at the Officers even after he was handcuffed. (DSOF ¶¶ 35-44, 48-49, 57-66, 1113, 122 & 128.) *See, e.g., James v. Hayward Police Dept.*, C 10-4009 SI PR, 2012 WL 1895952, at *9 (N.D. Cal. May 23, 2012), *aff'd sub nom. James v. Puga*, 585 Fed. Appx. 510 (9th Cir. 2014) ("The undisputed evidence shows that James was actively resisting arrest by initially taking flight, ignoring defendants' commands to give them his hands, and then physically struggling against being handcuffed.")

**Quantum of Force Used.** The totality of the above circumstances show that the government had significant interests in using a significant amount of force to restrain Mbegbu. In determining whether the amount of force the Officers used was objectively reasonable, the Ninth Circuit has instructed that officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). This is because the quick and difficult decisions officers make under stress about the amount of force to use should not be second-guessed with hindsight in the courtroom. *Id.*; *accord Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Here, the circumstances confronting the Officers were tense, and stressful, forcing them to make a series of split-second decisions about the amount of force needed to restrain Mbegbu, who gave them no time for deliberation by actively and aggressively resisting arrest.

**Closed Fist Strike and Pressure Point.** Officer Johnson's use of a closed fist strike was an intermediate level of force that was appropriate to stop Mbegbu when he kicked Officer Zemaitis in the groin. The fist strike momentarily dazed Mbegbu to allow Officer Johnson to grab his arm. Although Mbegbu quickly recovered and resumed active

13

resistance, these facts show that Officer Johnson's fist strike was not only appropriate, but made with a lawful purpose to effectuate an arrest. Likewise, the pressure point Officer Johnson used was only made to stop Mbegbu from kicking Officer Zemaitis, not for any purpose to harm unrelated to the arrest. Indeed, the amount of force was *de minimis*, given that there is no evidence the pressure point caused Mbegbu any pain, much less cardiac arrest and death.

*X2 Taser Dart Mode.* Mbegbu had just kicked Officers Gonzales in the shins and Officer Zemaitis in the groin and a closed fist strike from Officer Johnson did stop Mbegbu from actively resisting his attempt to grab and handcuff Mbegbu. (DSOF ¶¶ 39-43.) Seeing Officer Johnson struggling to restrain Mbegbu's arm, Officer Zemaitis took a couple of steps back, and from a distance of approximately six to eight feet, deployed his X2 Taser in dart mode, aiming at Mbegbu's center mass. (DSOF ¶ 44.) Although the probes hit Mbegbu in stomach area, it was only because he was facing him, not because he had the ability to target his back or side. (DSOF ¶ 47.) That the force was not excessive is apparent from the fact that the first cycle (11 seconds) had no apparent effect on Mbegbu, who was able to stand up and refused repeated commands to get down on the ground. (DSOF ¶ 46, 49-51.) Thus, Officer Zemaitis was uncertain whether the Taser had a proper connection, and administered a second cycle (6 seconds) only when Mbegbu reached for a pitcher that he believed could be thrown at the Officers. (DSOF ¶ 52.)

On these facts no jury can find that Officer Zemaitis' use of a Taser to stop Mbegbu from actively and aggressively resisting arrest *after* he assaulted three different officers was objectively unreasonable. *See, e.g., Beaver v. City of Fed. Way*, 301 F. App'x 704, 705 (9th Cir. 2008) (Taser use objectively reasonable because plaintiff was suspected of committing a daytime burglary, a felony in Washington, and attempted to flee from the officer, ignored a warning to stop, and remained non-compliant to the Officers' commands.); *Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012), *as amended on denial of reh'g* (Oct. 4, 2012) (holding that although the Taser showed 22 trigger pulls for total of 123 seconds of activation, the physical evidence only confirmed

14

nine Taser applications to the decedent, which when utilized on actively resisting and kicking suspect was found to be objectively reasonable). Moreover, Plaintiffs have no admissible evidence to support a contrary finding that the amount of force from the Taser was, under the facts confronting these officers, objectively unreasonable.

**_Take Down and Restraint on the Ground_**. No evidence exists that Mbegbu was slammed to the ground and choked by an unknown officer. Although Ngozi testified that Mbegbu was thrown to the ground, that statement is consistent with Officer Weber's account that he grabbed Mbegbu to prevent him from getting up, turned and took him to the ground on his stomach. (DSOF ¶¶ 54-55.) And while there was bleeding and swelling on the left-side of the head, that is consistent with Officer Johnson's fist strike, and there is no medical or other evidence that it resulted from the take down. (DSOF ¶ 103.) More important, this force was clearly not excessive, as it failed to stop Mbegbu from resisting arrest. (DSOF ¶¶ 35-44, 48-49, 57-66, 113, 122 & 128.)

Further, although Officer Johnson placed his knee/shin on Mbegbu's head/shoulder/ neck area, the amount of force was reasonable to hold him down, as Mbegbu kept trying to get back up and demonstrated so much strength that it required two officers working together to pull his arm out from underneath him and place it behind his back for handcuffing. (DSOF ¶ 60.) Indeed, Mbegbu was undisputedly much larger, bigger, heavier, and stronger than any of the Officers. (DSOF ¶ 26.) And the witness statements to police immediately following the incident are consistent with the Officers' accounts, which together show that Mbegbu resisted arrest and kicked an officer. (DSOF ¶¶ 35-44, 48-49, 57-66, 113, 122 & 128.) Ngozi and Ms. Odom admitted as much in their testimony. (DSOF ¶¶ 113, 122 & 128.) Likewise, Officer Weber's placement of a knee on Mbegbu's back to prevent him getting up was reasonable given that, even after handcuffing, he continued to kick and get up. (DSOF ¶ 64.) Similarly, Officer Zemaitis' grabbing of Mbegbu's legs and bending them at the knees to prevent him from kicking was objectively reasonable. (DSOF ¶ 65-66.) In any event, there is no evidence that any of these acts caused Mbegbu's cardiac arrest and death. Not to mention that Plaintiffs'

15

antiquated theory of positional asphyxia has been scientifically debunked, and no admissible evidence, expert or otherwise, exists to support their speculative claim of positional asphyxia/restraint induced cardiac arrest. (DSOF ¶ 107.)

Other courts have had no difficulty finding the use of body weight and leg restraints objectively reasonable as a matter of law under similar facts. *See, e.g., Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) ("Officer Riley placed just enough weight on Mr. Phillips to keep him from rolling over and kicking. If she had not held Mr. Phillips down . . . Mr. Phillips could have gotten up again and would have been a danger to himself, the officers and the hotel employees. . . . Officer Duarte then called an ambulance and took up a position at Mr. Phillips' feet to protect those around Mr. Phillips from his kicking. Officer Busch arrived immediately thereafter and solved the kicking danger by placing restraints on Mr. Phillips' legs. . . . It was reasonable to restrain Mr. Phillips' legs given the peril posed by his continued kicking.").

And although Plaintiffs alleged that some unknown officer used a chokehold when Mbegbu was being restrained on the ground, no evidence exists to support that claim. Plaintiff and Ms. Odom did not provide any testimony that they saw this alleged chokehold occur. In sum, all the *Graham* factors weigh in favor of finding the force used by these Officers was objectively reasonable. Defendants are entitled to judgment as a matter of law on the excessive force claims.[5]

## III.    THE OFFICERS DID NOT ACT WITH AN UNLAWFUL PURPOSE.

Plaintiffs cannot advance a Fourteenth Amendment loss of familial claim (Count 3) because the excessive force claims fail. *See Lacy v. County of Maricopa*, 631 F. Supp. 2d 1197, 1213 (D. Ariz. 2008) (dismissing Fourteenth Amendment derivative claim for loss of familial association because there was no underlying constitutional violation). If any portion of the excessive force claims survives, Plaintiffs must establish that the conduct

---

[5] While the failure of the excessive force claims precludes a failure to intervene theory of liability, there is also *no evidence* that the Officers, each of whom was focused on a different task in attempting to restrain Mbegbu, had any time or opportunity to intervene even assuming that misconduct had occurred.

"shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). If deliberation is possible, this standard can be met by showing that the officer acted with deliberate indifference. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Where, as here, the officer "faced an evolving set of circumstances that took place over a short period of time necessitating 'fast action,'" a plaintiff must make a higher showing that the officer "acted with a purpose to harm" the plaintiff. *Id.* at 1139.

In *Virgillo v. Fernandez*, 2014 WL 290749, at *7 (D. Ariz. 2014), the Arizona District Court defined this as evidence showing that the officer acted "maliciously or sadistically." Most recently the Ninth Circuit in *Biscotti v. Yuba City*, 2016 WL 360803 (9th Cir. 2016), stated that the purpose to harm standard cannot be met unless "actions were undertaken to induce . . . lawlessness, or to terrorize, cause harm, or kill." This is because Plaintiffs must prove that the Officers acted with a purpose to harm that was "unrelated to the legitimate object of arrest." *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008).

Here, the "purpose to harm" standard applies because Mbegbu immediately resisted arrest, forcing the Officers to make a series of split-second decisions regarding the appropriate force to use to stop him. Moreover, there is no evidence that the Officers acted with any motive beyond the lawful purpose to arrest Mbegbu for no less than five instances of aggravated assault against three officers, for disobeying commands to stop, and for actively resisting their attempts to arrest him. (DSOF ¶¶ 35-44, 48-49, 57-66, 113, 122 & 128.) There was also probable cause to arrest him for those crimes. Further, it is undisputed that the Officers did not know about the Mbegbu's many health conditions and were, instead, just reacting to a very large and very angry and combative person. (DSOF ¶¶ 94, 26.) Once placed in handcuffs, the Officers sat him up and began checking his vitals. (DSOF ¶ 69.) When it was discovered he was not breathing, the handcuffs were removed and life-saving measures began immediately. (DSOF ¶ 74-83.) No reasonable

jury can find on these facts that the Officers' conduct shocks the conscious or that they

acted with a purpose to harm *unrelated* to the lawful arrest.[6]

## IV.    THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity shields government officials "from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S.

800, 818 (1982). It applies "when an officer reasonably believes that his or her conduct

complies with the law," regardless of whether the officer is mistaken about the facts

and/or law. *Id.* at 231 *Pearson v. Callahan,* 555 U.S. 223, 245 (2009) (internal quotation

omitted). Qualified immunity thus "gives ample room for mistaken judgments by

protecting all but the plainly incompetent or those who knowingly violate the law."

*Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation omitted).

Qualified immunity analyzes two prongs: (1) the merits of the constitutional claim;

and (2) the issue of immunity. *See Johnson v. Cnty. of Los Angeles*, 340 F.3d 787, 791

(9th Cir. 2003). Plaintiffs' claim fails if insufficient evidence supports either prong, which

may be examined in either order. *Pearson*, 555 U.S. at 242. For the merits prong, the

Court should determine whether evidence establishes a constitutional violation. *Katz*,

533 U.S. at 201. Here, the merits prong fails for the same reasons the Officers did not

violate the Fourth or Fourteenth Amendment. *See supra* Sections II and III.

The immunity prong asks whether the constitutional right was clearly established

such that at the time of the challenged conduct, the contours of the right are sufficiently

clear such that every reasonable police officer would have understood that what he is

doing violates that right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Existing

precedent must have placed the statutory or constitutional question beyond debate." *Id.*

---

[6] *See, e.g., Lewis*, 523 U.S. at 835 (Willard's outrageous behavior was practically instantaneous, and so was Smith's instinctive response. While prudence would have repressed the reaction, Smith's instinct was to do his job, not to induce Willard's lawlessness, or to terrorize, cause harm, or kill. Prudence, that is, was subject to countervailing enforcement considerations, and while Smith exaggerated their demands, there is no reason to believe that they were tainted by an improper or malicious motive.").

Moreover, the right at issue should not be defined at a "high level of generality" but rather based on the specific factual context of the case. *Id.*

Here, Ninth Circuit precedent does *not* clearly establish that every police officer would have known that using a Taser to restrain a suspect who had just committed five acts of aggravated assault, and aggressively and actively resisted arrest was—beyond debate—unlawful. To the contrary, the case law clearly establishes the opposite—that Taser use in dart mode is an intermediate level of force that is appropriate to stop a combative and actively resisting suspect. *See Bryan v. MacPherson*, 630 F.3d 805, 910 (9th Cir. 2010); *see also Marquez*, 693 F.3d at 1175. That Mbegbu was completely unaffected by the Taser's first cycle and quickly resumed struggling after the second cycle make its use even more reasonable. *See, e.g., Estate of Martin v. United States*, No. 13CV1386-LAB BGS, 2015 WL 5568049, at *13 (S.D. Cal. Sept. 22, 2015) (non-lethal Taser in dart mode—an 'intermediate, significant level of force'—near flammable material, causing an explosion that killed suspect who fled border patrol agents in vehicle to evade arrest, did not violate clearly established right under *Bryan*).

Likewise, it was clearly established that the lesser forces used to restrain Mbegbu: (1) a closed-fist strike and pressure point to restrain him and stop him from kicking Officer Zemaitis; (2) taking him to the ground in a prone position because he kept trying to get up and had refused commands to get down; (3) placing a knee to hold down to pull his arms out from underneath him and apply handcuffs, and to prevent the him from rolling over and getting up; and (4) bending his leg at the knee and holding his legs down to prevent him from kicking at the Officers—are all objectively reasonable as a matter of law where, as here, the suspect was combative and actively resisting. *See Luchtel v. Hagemann*, 623 F.3rd 975, 981 (9th Cir. 2010) (pinning actively resisting and aggressive suspect to the ground for handcuffing objectively reasonable); *Gregory v. County of Maui*, 523 F.3d 1103, 1107-08 (9th Cir. 2008) (neck restraint and pinning down suspect who resisted objectively reasonable where evidence was suspect died of sudden cardiac arrest induced by drugs); *see also, e.g., Hansen v. Pierce County*, C05-5518 RJB, 2006 WL

19

2136761, at *11 (W.D. Wash. July 28, 2006) (wrist hold, physical attempts to force the arms behind his back, wrestling, several Taser shocks, and *use of a police dog* to hold the leg of armed robbery suspect, who was actually unarmed and intoxicated when he failed to comply with commands to show his hands, did not violate clearly established law).

## V.       PLAINTIFFS CANNOT ESTABLISH A WRONGFUL DEATH CLAIM.

Plaintiffs' claim that Defendants were negligent or grossly negligent in causing Mbegbu's wrongful death fails for the same reasons that the Officers' conduct was objectively reasonable under federal law. *See Ekweani v. Maricopa Cnty. Sheriff's Office*, 2010 WL 2079773, at *7 (D. Ariz. May 24, 2010) (force justified under Arizona statute for the same reasons it was reasonable under Fourth Amendment analysis). Plaintiffs have insufficient evidence, in any event, to establish the elements of duty, breach, and proximate cause for such a claim. Because police practices and the appropriateness of tactics for restraining an actively resisting suspect involve highly technical matters well beyond the common knowledge of a lay person—Plaintiffs' failure to establish expert evidence on the applicable standard of care is fatal to their wrongful death claim. *See Naki v. Hawaii*, No. CV-13-02189-PHX-JAT, 2015 WL 5954823, at *2 (D. Ariz. Oct. 14, 2015) ("[U]nder Arizona law, when 'the alleged lack of care occurred during [a] professional or business activity, the plaintiff must present expert witness testimony as to the care and competence prevalent in the business or profession.'") (citation omitted); *Edwards v. Okie Dokie, Inc.,* 473 F. Supp. 2d 31, 46 (D.D.C. 2007) (holding the standard of care for police who respond to an altercation is "simply not" within "the common knowledge and everyday experience of lay people."). Moreover, Plaintiffs have not identified any evidence that the Officers failed to use ordinary care, much less gross negligence. The Use of Force Review Board's and Meyer's determinations that the officers' actions were justified in this case are unrefuted. (DSOF ¶ 108.)

Plaintiffs also cannot establish causation, as no evidence exists—expert or otherwise—from which a jury could reasonably find that the Officers' conduct caused Mbegbu's cardiac arrest and death. Finally, Plaintiffs have not identified any allegation or

evidence that the City itself was at fault. And even assuming evidence exists to support such claims, the City cannot be liable for any negligent hiring, retention, or supervision of the Officers, *or* vicariously liable for their actions, because the underlying claims against them fail. *See Kuehn v. Stanley*, 208 Ariz. 124, 130, ¶ 21, 91 P.3d 346, 352 (App. 2004).

## VI. PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES.

Plaintiffs are not entitled to punitive damages under federal law because there is no evidence the Officers were motivated by an evil mind, or reckless and callously indifferent in trying to arrest Mbegbu. *See Smith v. Wade*, 461 U.S. 30, 56 (1983). Nor is there any evidence that deterrence above and beyond that already available through compensatory damages is warranted under the circumstances. *See Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 310 (1986). Finally, punitive damages are also unavailable under state law. *See* A.R.S. § 12-820.04.

## VII. CONCLUSION

For these reasons, Defendants are entitled to summary judgment on all claims.

DATED April 21, 2017.

STRUCK WIENEKE & LOVE, P.L.C.


By    /s/ Christina Retts
    Kathleen L. Wieneke
    Christina Retts
    3100 West Ray Road, Suite 300
    Chandler, Arizona  85226
    Attorneys for Defendants City of Phoenix, Matthew Johnson, Celina Gonzales, Joel Zemaitis and William Weber

3316137.1

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sabinus A. Megwa          megwalaw@qwestoffice.net

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ Christina Retts