Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1699
kwieneke@swlfirm.com
cretts@swlfirm.com

Attorneys for Defendants City of Phoenix,
Matthew Johnson, Celina Gonzales, Joel
Zemaitis and William Weber

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Ngozi Mbegbu, individually as the surviving spouse of decedent Balantine Mbegbu and on behalf of decedent's children Ogechukwu Amarachukwu Gloria Mbegbu and C.C.E.M. (a minor) as the statutory beneficiaries of Balantine Mbegbu; and as Personal Representative of the Estate of Balantine Mbegbu, <br><br> Plaintiffs, <br><br> v. <br><br> City of Phoenix, et al., <br><br> Defendants. | NO. 2:16-cv-00424-DGC <br><br> **DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Defendants City of Phoenix, Johnson, Gonzales, Zemaitis and Weber submit this Statement of Facts in support of their Motion for Summary Judgment.

**I.      USE OF FORCE INCIDENT**

1.      On October 6, 2014, at approximately 8:47 p.m., decedent Balantine Mbegbu ("Mbegbu") called his best friend, Geralds, to complain that his wife, Plaintiff Ngozi Mbegbu ("Ngozi), had threatened to call the police. (Ex. 1 Interview of Geralds Ude-Onyibor (audio) at 0:00-1:10; 3:13-3:31 & 3:40-4:43; Ex. 2 Deposition of Ngozi Mbegbu at 42:18-43:4.)

2. Mbegbu sounded "very angry and very upset" that Ngozi and their son C.C.E.M. ("the son") were coming home late at night from the wife's social group meetings and the son's basketball practice. (Ex. 1 at 1:10-2:29 &10:40-11:55.)

3. Mbegbu told Geralds that he or his wife would die that day. (Ex. 1 at 2:20-2:48)

4. Geralds listened for nine minutes as Mbegbu repeated his complaints over and over again. (Ex. 1 at 2:49-3:18; 3:31-3:40 & 10:32-11:55.)

5. When the call ended, Geralds called 911 because he was concerned that the fight would get out of hand. (Ex. 1 at 4:43-6:58; Ex. 3 Call for Service at COP_BM00274.)

6. Geralds explained to investigators that Mbegbu sounded "very, very upset" and was stammering, which in their (Nigerian) culture, means that he should be approached with "much caution" because he can act "out of anger even if it is unnecessary." (Ex. 1 at 3:41-3:53 & 6:21-6:58.)

7. Geralds had known Mbegbu since late 2009 or early 2010, and believed Mbegbu had a "short temper" and "[would get] angry easily." (Ex. 1 at 7:00-7:23 & 8:21-8:30.)

8. At approximately 9:11 p.m., Officers Gonzales and Johnson responded to the call and contacted Ngozi standing by the street outside her house. (Ex. 4 PSB Officer Interview Transcripts and Investigative Report at COP_BM0145; -179-80; -121; Ex. 2 at 51:13-18.)

9. Ngozi told the Officers she was fine and that she was going to pick up her son. (Ex. 4 at COP_BM0145; Ex. 2 at 52:25-54:5.)

10. After the Officers explained that they received a call from a concerned friend, Ngozi said that she was a law-abiding citizen and appreciated what the Officers do. (Ex. 4 at COP_BM0146; Ex. 2 at 52:25-54:5.)

11. Ngozi then began telling them about the son, that he plays basketball, and that she needed to go pick him up from the gym. (Ex. 4 at COP_BM0145-46; -180.)

12. Ngozi, who is Nigerian and speaks with a heavy accent, said something that suggested she wanted them to follow her, and she led them to the front door of the house. (Ex. 4 at COP_BM0145; -180; Ex. 2 at 55:2-14; 112:19-113:4.)

13. Ngozi banged on the door, said something in a foreign language, banged on the door again, and opened it. (Ex. 4 at COP_BM0146.)

14. Ngozi invited the Officers inside and began showing them pictures on the wall of her children. (Ex. 4 at COP_BM0180, 0202; -0146; Ex. 2 at 55:2-8; 112:19-113:4.)

15. Mbegbu was sitting in the dining/living room area near a sliding glass door. (Ex. 4 at COP_BM0146-4; -0202.)

16. When Mbegbu saw the Officers, he became furious and jumped from his chair, yelling and demanding to know if Ngozi called the police and accusing the Officers of coming to kill him. (Ex. 4 at COP_BM0147-48; Ex. 2 at 48:3-48:22; 55:4-56:25; 59:3-25; 61:6-9; Ex. 5 City of Phoenix Department Report Excerpts at COP_BM0021 & 0025.)

17. On a scale of one to 10, with 10 being the loudest volume, Mbegbu yelled at a "10." (Ex. 4 at COP_BM0181; 0205-06.)

18. Mbegbu's voice sounded angry. (Ex. 2 at 59:1-6; 61:6-9; 68:6-69:3.)

19. Officer Johnson tried to calm him down and explain they were not there to kill him and that the wife was just showing them pictures of the children. (Ex. 4 at COP_BM0147; Ex. 2 at 91:5-16; Ex. 6 Deposition of Sabinah Odom at 13:13-24.)

20. Mbegbu approached the Officers standing near the door and came within six to eight inches of Officer Johnson's face, pointing his index finger at him while yelling at him. (Ex. 4 at COP_BM0147-48; -0181; Ex. 6 at 22:14-23:8-19.)

21. Because he was invading Officer Johnson's personal space, and Officer Johnson felt uncomfortable with his back towards the door and wall, Officer Johnson placed his right hand on Mbegbu's chest and extended his arm to create some space between them. (Ex. 4 at COP_BM0181-82; -0189-190; -0203; Ex. 6 at 22:14-23:8-19.)

22. Because Officer Johnson did not use much force and because Mbegbu was a much larger and heavier man (over 200 pounds) Officer Johnson was only able to move Mbegbu's upper body back slightly. (Ex. 4 at COP_BM0181.)

23. "[A]mped up," Mbegbu swatted Officer Johnson's arm away in an aggressive manner that showed he was ready to "get physical." (Ex. 4 at COP_BM0204-05.)

24. Mbegbu's swatting Officer Johnson's hand away in this aggressive manner constituted aggravated assault on a peace officer, a Class 5 felony under Arizona law. *See* Ariz. Rev. Stat. § 13-1204(A)(8) & (E).

25. Given the level of Mbegbu's aggression, Officer Johnson anticipated a physical resistance and believed that he and Officer Gonzales had a considerable size disadvantage. (Ex. 4 at COP_BM0181-82; -194.)

26. Mbegbu was undisputedly much larger, bigger, heavier, and stronger than any of the Officers. (Ex. 2 at 60:1-61:5; 79:15-80:2; Ex. 6 at 27:7-28:15;27:3-28:15; 38:16-24; Ex. 7 Deposition of C.C.E.M. at 25:14-23.)

27. Officer Johnson also believed that it would have been unsafe for Ngozi to leave because he had been "very aggressive" and might redirect his anger and aggression at her. (Ex. 4 at COP_BM019, -0187-88.)

28. The Officers decided to try and verbally persuade him to calm down and call for backup. (Ex. 4 at COP_BM0181-82.)

29. Officer Johnson quietly whispered to Officer Gonzales the plan to arrest Mbegbu. (Ex. 4 at COP_BM0181-82; -194.)

30. At 9:17 p.m., Officer Gonzales radioed for backup. (Ex. 8 Unit History Activity Report at COP_BM0267.)

31. After approximately two minutes of trying to calm Mbegbu down, he returned to the chair and sat down. (Ex. 4 at COP_BM0181; -192.)

32. Officer Zemaitis responded the radio call for backup and understood that it involved a situation where a man was combative with his wife or girlfriend, (Ex. 4 at COP_BM0241.)

33. At 9:20 p.m., Officer Zemaitis arrived at the house and heard Mbegbu yelling loudly. (Ex. 4 at COP_BM0241; -245.)

34. Officer Zemaitis entered the house and immediately understood, from having previously worked with Officer Johnson and after a brief discussion, that Officer Johnson wanted Mbegbu arrested. (Ex. 4 at COP_BM0245-46.)

35. Officers Zemaitis, Johnson and Gonzales walked over to the chair, and Officer Johnson grabbed Mbegbu's left arm to arrest him. (Ex. 4 at COP_BM0148; -0182; -0240.)

36. Mbegbu jerked violently, splashing a cup of hot liquid all over Officers Gonzales and Zemaitis, who stood in front of Mbegbu, spilling the liquid on the floor and making it slippery. (Ex. 4 at COP_BM0182; -0149.)

37. Mbegbu stood up and tensed his body, flailed his arms around, and fell back into the chair. (Ex. 4 at COP_BM0148.)

38. Mbegbu then kicked his legs at the Officers to prevent them from arresting him. (Ex. 4 at COP_BM0148; -0182; -0241.)

39. Mbegbu kicked Officer Gonzales three times: once on the right shin and twice on the left shin. (Ex. 4 at COP_BM0148; -0247-48.)

40. Mbegbu then kicked Officer Zemaitis in his right thigh/groin area. (Ex. 4 at COP_BM0182; -194-95; -0264.)

41. To stop Mbegbu, Officer Johnson delivered one closed-fist strike to the side of Mbegbu's face, momentarily dazing him. (Ex. 4 at COP_BM0182; -195.)

42. On a scale of one to 10, with 10 being the most force, Officer Johnson estimated that his punch was a "maybe a six." (Ex. 4 at COP_BM0207.)

43. Officer Johnson used that opportunity to grab Mbegbu's arm, but he quickly recovered and resumed struggling and resisting arrest. (Ex. 4 at COP_BM000182-183.)

44. Seeing Officer Johnson struggling to restrain Mbegbu's arm, Officer Zemaitis took a couple of steps back, and from a distance of approximately six to eight feet, deployed his X2 Taser in dart mode, aiming at Mbegbu's center mass. (Ex. 4 at COP_BM0241.)

45. Officer Johnson heard the Taser pop and let go of Mbegbu's arm. (Ex. 4 at COP_BM0182; -196.)

46. The probes attached to Mbegbu's stomach and Officer Zemaitis delivered an 11-second cycle, but it did not incapacitate Mbegbu. (Ex. 4 at COP_BM0121, -0148-149, -0183, -0197, -0241-242.)

47. Although the probes hit Mbegbu in stomach area, it was only because he was facing him, not because he had the ability to target his back or side. (Ex. 4 at COP_BM0236; -261; -0149.)

48. Mbegbu continued flailing his arms and kicking at the Officers. (Ex. 4 at COP_BM0242.)

49. Clenching his fists, Mbegbu stood from the chair to his feet and refused commands to get down on the ground. (Ex. 4 at COP_BM0182, -197; -0149; -0241; -0250.)

50. Officer Zemaitis was unsure whether the Taser connection was active because it apparently had no effect on Mbegbu. (Ex. 4 at COP_BM0250-51; -0253; -0262; -0197.)

51. Officer Zemaitis then saw Mbegbu reach for a pitcher on the table next to him and believed that he might throw it at the Officers. (Ex. 4 at COP_BM0241-42, -0252.)

52. Officer Zemaitis thus delivered a 6-second cycle, and Mbegbu fell to the ground. (Ex. 4 at COP_BM049; -0199; -0251; -262)

53. At approximately 9:18 p.m., Officer Weber arrived at the house and heard the sound of the Taser deploy, so he ran inside to see Mbegbu seated with a pitcher in his hand. (Ex. 4 at COP_BM0220; -222.)

54. Officer Weber saw Mbegbu fall to the ground (after the second Taser cycle), but immediately try to get back up. (Ex. 4 at COP_BM0220; -0222.)

55. Officer Weber ran to Mbegbu and grabbed him, turning him and taking him back down to the ground on his stomach. (Ex. 4 at COP_BM0220; -0254.)

56. Officers Johnson tried to grab Mbegbu's left arm, but it was pinned underneath Mbegbu's body as he continued to resist. (Ex. 4 at COP_BM0183 & -0199; -0220 & -0226; -0149.)

57. Mbegbu continued to kick his legs and flop around, hitting the Officers and preventing them from securing his arm behind his back. (Ex. 4 at COP_BM0149; -0183; -0227.)

58. Officer Johnson placed his knee/shin on Mbegbu's head/shoulder/neck area to hold him down as they tried to pull his left arm out from underneath his body to handcuff. (Ex. 4 at COP_BM0183; -0210)

59. Opposite them, Officer Weber tried to grab Mbegbu's right arm, which was also pinned beneath the body, because Mbegbu refused to comply with orders to put his arm behind his back. (Ex. 4 at COP_BM0220.)

60. Officer Gonzales helped Officer Johnson handcuff Mbegbu's left arm, then helped Officer Weber pull the right arm out and link the handcuffs. (Ex. 4 at COP_BM0149 & -0157; -0183; -0220-221.)

61. Mbegbu, however, still did not stop resisting and kicked at Officer Zemaitis. (Ex. 4 at COP_BM0221; -0242; -0144 & -0149.)

62. To stop Mbegbu from kicking at the Officers, Officer Johnson pressed his thumb on a pressure point behind Mbegbu's ear/neck area for approximately three seconds, but Mbegbu tried to roll over and get up. (Ex. 4 at COP_BM0183.)

63. Officer Weber heard Officer Zemaitis yelling for Mbegbu to stop kicking at him, and saw Mbegbu swinging his legs and striking Officer Zemaitis' legs. (Ex. 4 at COP_BM0221, -0223.)

64. Seeing Mbegbu try to roll over and get up again, Officer Weber placed his knee on Mbegbu's back to hold him down. (Ex. 4 at COP_BM0221.)

65. Mbegbu continued to resist and kick at the officers for approximately another minute after he was handcuffed. (Ex. 4 at COP_BM0149; -0201; -0224; 0260.)

66. Because Mbegbu continued kicking, Officer Zemaitis grabbed Mbegbu's legs, bent them at the knees, and held them down. (Ex. 4 at COP_BM0242-43, -0255.)

67. At 9:21 p.m., Officer Weber cleared the radio and requested a RIPP restraint for the legs. (Ex. 4 at COP_BM0149; -0241; -0268.)

68. The Officers then noticed that Mbegbu had stopped moving. (Ex. 4 at COP_BM0201; -0221.)

69. Officer Zemaitis checked Mbegbu's neck and felt a faint pulse. (Ex. 4 at COP_BM0166; -0243.)

70. The Officers rolled Mbegbu to a seated position against Officer Zemaitis' leg, and Mbegbu's head slumped forward. (Ex. 4 at COP_BM0243.)

71. At 9:23 p.m., Officer O'Neil arrived and saw that Mbegbu had been restrained and sitting up; Mbegbu's eyes were closed, but he was moving slightly. (Ex. 5 at COP_BM0039.)

72. Officer Pelke also arrived and saw Mbegbu restrained and sitting against Officer Zemaitis legs. (Ex. 5 at COP_BM0094; Ex. 4 at COP_BM0150.)

73. Officer Pelke offered a RIPP restraint, but Officer Zemaitis said it was not necessary. (Ex. 5 at COP_BM0094-95; Ex. 4 at COP_BM0149.)

74. Officer Pelke then looked at Mbegbu for a few seconds but could not tell whether he was still breathing. (Ex. 5 at COP_BM0095.)

75. The Officers removed the handcuffs and rolled him onto his back to check for vitals. (Ex. 4 COP_BM0244; -0150.)

76. At 9:24 p.m., Officer Weber radioed dispatch to request the fire department paramedics and a supervisor to report the Taser use. (Ex. 4 at COP_BM0221; -243; -268 & -0274.)

77. Both Officers Gonzales and Weber saw Mbegbu's stomach move back and forth, and he appeared to be breathing. (Ex. 4 at COP_BM0149-50; -221; -0243.)

78. Officer Zemaitis believed he felt a pulse, but was not sure whether it was his own adrenaline. (Ex. 4 at COP_BM0243.)

79. Other officers checked but could not detect breathing. (Ex. 4 at COP_BM0222; -0184.)

80. Officer Zemaitis then cleared Mbegbu's throat and began CPR. (Ex. 4 at COP_BM0150.)

81. When Officer Zemaitis was tired from administering chest compressions, Officer Gonzales took over. (Ex. 4 at COP_BM0150, -0166; -0184-85; -0222.)

82. When Officer Gonzales was tired, Officer Johnson took over chest compressions until the fire department arrived. (Ex. 4 at COP_BM0150, -0166; -184-85; -0222.)

83. At 9:29 p.m., the Officers radioed a request for the fire department to "step it up." (Ex. 8 at COP_BM0268; Ex. 5 at COP_BM0095.)

84. When the paramedics arrived, they noted that Mbegbu's heart rate was asystole and took him to the hospital, where he was later pronounced dead. (Ex. 9 Medical Examiners Report at COP_BM0276; Ex. 10 Honor Health medical records at COP_BM01711-1716 & 1726.)

## II. HISTORY OF DOMESTIC VIOLENCE AND ANGER PROBLEMS.

85. Mbegbu's family members believe that his personality changed and anger issues began, approximately one year before this incident because he was always mad about the son coming home late from basketball practice. (Ex. 2 at 54:6-16; 104:20-105:3.)

86. Mbegbu's children described Mbegbu as having a "stress-induced" temper because of financial problems and would become "quite angry" once every two or three weeks and stuttered only when he was angry. (Ex. 11 Deposition of Mimi Mbebgu at 42:4-9; 43:8-44:1; Ex. 7 at 23:17-25.)

87. Ngozi explained that Mbegbu would get angry whenever she brought her son home late from the gym and warn the son that he would beat him if he was late again. (Ex. 2 at 54:6-16.)

88. On May 11, 2014, the daughter called 911 because Mbegbu had been fighting with everyone in the house and refused to allow them to leave to drive a visiting aunt home. (Ex. 11 at 40:16-41:17; 42:10-12; Ex. 2 at 102:15-12; Ex. 5 at COP_BM0079.)

89. Mbegbu complained to the officer that no one in the family respected him, and that, instead of spending all his money, they should show him respect because he owned the house and was in charge. (Ex. 5 at COP_BM0080.)

90. Mbegbu would not listen to the officer and had to be told a couple of times to sit down and relax. (*Id.*)

91. On May 13, 2014, the son's high school assistant principal reported to the police that Mbegbu had made 15 to 20 harassing phone calls, sounding like an "insane" person and accusing the assistant principal of burning down Mbegbu's house. (Ex. 5 at COP_BM0077)

92. The assistant principal was aware that police had been involved with the family for domestic violence issues and wanted the incident reported in case Mbegbu escalated the matter. (*Id.*)

93. Approximately six months before this incident, Mbegbu hit Ngozi when she pleaded with him to not beat up the son for coming back late from the gym. (Ex. 2 at 101:16-25.)

**III. MEDICAL EVIDENCE**

94. Unknown to the Officers, Mbegbu had numerous medical problems, including diabetes, hypertension, arteriosclerosis, and sickle-cell anemia trait. (Ex. 9 at COP_BM0281; Ex. 13 Expert Report of Charles Wetli at COP_BM2141-43.)

95. The medical examiner concluded that the cause of death was "[c]ardiac arrest in the setting of acute cyclobenzaprine intoxication, multiple medical problems, and

law enforcement subdual" and the manner of death was "[u]ndetermined." (Ex. 9 at COP_BM0275.)

96. The medical examiner reported the circumstances of Mbegbu's death included numerous medical problems aggravated by his struggle with officers who tried to subdue him as he actively resisted arrest for aggravated assault. (Ex. 9 at COP_BM0276.)

## IV. DR. BECKSON'S PSYCHIATRIC EXPERT OPINIONS

97. Mace Beckson is a Board certified physician in Psychiatry and Forensic Psychiatry. (Ex. 12 Expert Report of Mace Beckson at COP_BM2330.)

98. Dr. Beckson thus opined that the Officers correctly perceived Mbegbu as a safety threat given the comments he made to Geralds that he or his wife would die that day and his aggressive and combative behavior in interacting with the Officers. (*Id.* at COP_BM2354.)

## V. DR. VILKE'S MEDICAL EXPERT OPINIONS

99. The City's medical causation expert, Gary Vilke, is an emergency department physician, independent researcher, and published medical expert in the fields of human physiology and the effects of positional restraints and positional asphyxia, neck holds, Taser electronic control devices (ECDs), and in-custody cardiac arrests and death. (Ex. 14 Expert Report of Gary Vilke at COP_BM2047-50.)

100. Dr. Vilke opined to a reasonable degree of medical certainty that Mbegbu's sudden cardiac arrest and death were not caused or contributed to by the Officers' conduct. (Id. at COP_BM2040-42.)

101. Dr. Vilke explained that Mbegbu could not have been asphyxiated because: (1) he was taken into custody within 60 to 90 seconds; (2) he continued moving his body, flailing his arms, and kicking to resist arrest, and continued kicking after he was handcuffed, showing that he was breathing; (3) the weight of Officer Johnson's knee on his upper torso during the restraint, Officer Weber's knee on his back to prevent him from rolling over, and Officer Zemaitis' bending Mbegbu's legs at the knees and holding them

down—could not have impaired his breathing ability; and (4) Mbegbu continued breathing after he was restrained. (Id. at COP_BM2042-43.)

102. Dr. Vilke also opined that the Taser did not cause or contribute to Mbegbu's death because none of the five factors that must be present for a Taser charge to possibly cause cardiac arrest and death were not present, and belied by the evidence that Mbegbu did not die instantly but continued to physically struggle with the Officers, and that the paramedics noted an asystole rhythm, not the VF rhythm typical of an electrocution. (Id. at COP_BM2044-45.)

103. Dr. Vilke further opined that the closed-fist strike to Mbegbu's left-side of the face did not cause or contribute to his death because the autopsy results show only superficial laceration and bruising near the forehead/eye area, but no intracranial injuries. (Id. at COP_BM2047.)

104. Dr. Vilke found no soft tissue or neck bone injury to medically indicate that a chokehold was used. (Id. COP_2045-46.)

## VI. DR. WETLI'S PATHOLOGY EXPERT OPINIONS

105. Dr. Charles Wetli is a Board-certified forensic pathologist and member of the National Association of Medical Examiners with extensive independent scientific research experience and publications in the field. (Ex. 13 at COP_BM02144-70.)

106. Dr. Wetli opined to a reasonable degree of medical certainty that Mbegbu's death was caused by a combination of: (1) the high level of cyclobenzaprine in the blood which is known to cause agitation and psychosis demonstrated by his aggressive behavior; (2) excited delirium, as demonstrated by that same violent and psychotic behavior and his unexpected strength and intense physical exertion, and by the profound drop in blood pH, sudden loss of vital signs, and a terminal heart rhythm of asystole; and (3) sudden death caused by the sickle cell trait that limited the ability of his red blood cells to carry sufficient oxygen to support his intense physical exertion. (Ex. 13 at COP_BM2141-43.)

107. Dr. Wetli further opined that the Officers' conduct could not have caused or contributed to Mbegbu's cardiac arrest and death because: (1) he did not die within 15

seconds after the Taser deployment but continued to physically struggle with the Officers; and (2) the theory of positional asphyxiation by restraint in a prone position has been debunked by recent findings that lying in a prone position actually facilitates breathing. (*Id.* at COP_BM2142.)

## VII. THE OFFICERS USED REASONABLE FORCE.

108. The Professional Standards Bureau ("PSB") conducted an internal investigation, and the Use of Force Board found that the Officers' use of force was within policy. (Ex. 15 Use of Force Incident Review at COP_BM0120; Ex. 4 at COP_BM0121-134.)

109. The Maricopa County Attorney's Office independently reviewed the incident and found that the Officers did not commit any act warranting criminal prosecution. (Ex. 4 at COP_BM0126.)

110. Greg Meyer, a former Los Angeles Police captain and member of its Tactics Training Review Committee, is Defendants' police policy and practices expert. (Ex. 16 Expert Report of Greg Meyer at COP_BM2190-91.)

111. Meyer explained that: (1) Taser deployment on a resisting suspect typically results in fewer and less injuries to officers and suspects compared to other nonlethal police tools and tactics; (2) it is important for police officers to act quickly to gain compliance to avoid escalation and injuries that tend to result from prolonged struggles; and (3) domestic violence calls are particularly volatile and dangerous situations. (Ex. 16 at COP_BM2184-85.)

## VIII. OTHER RELEVANT FACTS

112. Ngozi and Ms. Odom both testified that they told the truth in their witness interview with the detectives, and Ms. Odom admitted that her memory has faded since then. (Ex. 2 at 47:21-24; Ex. 6 at 33:25-34:9; 45:24-46:2.)

113. Ngozi and Ms. Odom admitted in their testimony that Mbegbu pulled away when Officers Johnson and Zemaitis tried to arrest him, flailed his arms with closed fists, and kicked at the Officers, and physically struggled with them to resist arrest. (Ex. 2 at

77:11-80:2; 79:1-11; 81:15-82:12; 85:10-14; 87:3-12; 88:24-89:16; 95:17-96:4; Ex. 6 at 54:19-24.)

114. Ngozi and her sister—who were the only two other witnesses—were shown photographs of the Officers, but mostly could not correctly identify who allegedly did what, when, why, or how. (Ex. 2 at 75:24-76:6; 86:17-25; Ex. 6 at 22:1-4; 32:3-14; 43:17-20; Ex. 2 Depo. Exhibits 1, 2, 3 & 4)

115. Ngozi could not distinguish between Officers Zemaitis and Weber—who look nothing alike. (Ex. 2 at 50:18-51:2; 77:6-10; Ex. 2 Depo. Exhibits 1 and 4.)

116. Ms. Odom remembered Officers Gonzales because she was the only female officer. (Ex. 6 at 22:1-4; 32:8-12.)

117. Ngozi and Ms. Odom testified that Officer Gonzales (the female officer) merely touched Mbegbu's hand for five seconds to help him up off the ground. (Ex. 2 at 62:11-63:8; 78:4-10; 89:17-22.)

118. Ngozi also remembers Officer Gonzales calling the paramedics and that the Officers repeatedly trying administer first aid to save Mbegbu until the paramedics arrived. (Ex. 2 at 74:25-75:10.)

119. At her deposition, Ngozi could not describe the Taser's shape or color, stating that her eyes were full of tears and she was too confused to see anything. (Ex. 2 at 69:23-70:14.)

120. Ms. Odom also testified that she was unable to see Mbegbu clearly from where she was standing during the incident. (Ex. 6 at 53:15:-54:4.)

121. Ms. Odom testified that she "did not see" whether Mbegbu struggled or moved his body to resist arrest because her entire body was just "shivering." (Ex. 6 at 26:10-15.)

122. Ms. Odom testified, however, that she did see Mbegbu kick and hit one of the officers with his leg right before the Taser use. (Ex. 6 at 26:16-18.)

123. Both Ngozi and Ms. Odom misidentified Officer Weber (the fourth officer to arrive) as the one who used the Taser, when it was in actuality Officer Zemaitis. (Ex. 2 at 82:9-83:3; Ex. 6 at 22:1-4. 21-23; 32:8-12.)

124. Ngozi and Ms. Odom stood near the doorway or were outside in the courtyard during the much of the incident after the initial encounter. (Ex. 4 at COP_BM0218; -0242; -0149; Ex. 5 at COP_BM0039.)

125. Ms. Odom testified that she was unable to see Mbegbu clearly from where she was standing during the incident. (Ex. 6 at 53:15-54:4.)

126. Ngozi reported that she had argued with her husband that night because he was again upset about C.C.E.M. coming home late from the gym. (Ex. 5 COP_BM0021.)

127. Ngozi also reported that Mbegbu had hit her six to eight months before the incident. (Ex. 5 at COP_BM0022.)

128. Ms. Odom reported that Mbegbu kicked one of the officers. (Ex. 5 at COP_BM0025.)

129. Ms. Odom also admitted to investigators that she did not see the entire incident. (Ex. 5 at COP_BM0025.)

130. The investigators collected one yellow and black X2 Taser from Officer Zemaitis as evidence. (Ex. 5 at COP_BM0030.)

131. The only force Officer Weber used was to grab Mbegbu's wrist and arms to handcuff, and to apply pressure with his knee on Mbegbu's back to prevent him from rolling over to get up and hold him down. Ex. 4 at COP_BM0217.)

DATED April 21, 2017.

STRUCK WIENEKE & LOVE, P.L.C.

By /s/ Christina Retts
Kathleen L. Wieneke
Christina Retts
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Attorneys for Defendants City of Phoenix, Matthew Johnson, Celina Gonzales, Joel Zemaitis and William Weber

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sabinus A. Megwa          megwalaw@qwestoffice.net

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ Christina Retts