SABINUS A. MEGWA, ESQ.
The Megwa Law Office
6811 South Central Ave
Phoenix, Arizona 85042
Telephone: (602) 243-6151
State Bar Number: 011266

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Ngozi Mbegbu, individually as the surviving spouse of decedent Balantine Mbegbu and on behalf of decedent's children Ogechukwu Amarachukwu Gloria Mbegbu and C.C.E.M. (a minor) as the statutory beneficiaries of Balantine Mbegbu; and as Personal Representative of the Estate of Balantine Mbegbu, <br><br> Plaintiffs, <br> v. <br> City of Phoenix, et al., <br><br> Defendants. | No. 2:16-cv-00424-DGC <br><br> **PLAINTIFFS' RESPONSIVE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs Ngozi Mbegbu, individually as the surviving spouse of decedent Balantine Mbegbu and on behalf of decedent's children Ogechukwu Amarachukwu Gloria Mbegbu and C.C.E.M. (a minor) as the statutory beneficiaries of Balantine Mbegbu and as Personal Representative of the Estate of Balantine Mbegbu ("Plaintiffs"), by and through their attorney undersigned, submits the following responsive memorandum in opposition to the Motion for Summary Judgment filed by Defendants City of Phoenix ("the City") and Officers Matthew Johnson, Celina Gonzales, Joel Zemaitis, and William Weber ("Defendants"). For the reasons set forth below, Plaintiffs respectfully request that the Defendants' motion be denied.

**FACTUAL BACKGROUND**

On October 6, 2014, Officers Gonzales and Johnson responded to a call from a third

party regarding a potential domestic violence situation at the Mbegbu residence. (Defendants' Statement of Facts ("DSOF") ¶¶ 1, 5, 8). Upon arriving at the residence, the Officers saw Ngozi Mbegbu ("Ngozi"), the wife, standing outside. (DSOF ¶ 8). She told the Officers she was fine and that she was going to pick up her son, and that she appreciated what they do but that she was a law-abiding citizen. (DSOF ¶¶ 9, 10). The Officers then asked Ngozi if they could go see her husband, Balantine Mbegbu ("Mbegbu"), and she assented. (Plaintiffs' Statement of Facts ("PSOF") ¶ 53). The Officers then followed her as she approached the house and entered the house before her. (PSOF ¶ 54).

Mbegbu was seated in a chair in the living room when the Officers entered his home. (PSOF ¶ 55). Upon seeing the Officers, Mbegbu asked them to leave and if they were there to kill him; however, Mbegbu did not in any way verbally threaten the Officers. (PSOF ¶¶ 56, 57). Mbegbu told the Officers, "I say you should leave my house. Go." (PSOF ¶ 58). Once Ngozi heard Mbegbu ask the Officers to leave, she asked them to leave as well, saying "Leave. He said that you guys should leave. Leave." (PSOF ¶ 59). Mbegbu was not yelling at the Officers, although he spoke with a stammer that made his voice "high." (PSOF ¶ 61). The Officers did not answer Mbegbu. (PSOF ¶ 62).

The Officers then advanced toward Mbegbu, who got up from his chair. (PSOF ¶ 63). The Officers asked Mbegbu to sit down and he complied. (PSOF ¶ 64). Defendants allege that during this time, Officer Johnson pushed Mbegbu and Mbegbu "swatted" Officer Johnson's hand or arm away. (DSOF ¶¶ 21, 23). The Officers' recollections were inconsistent to the extent that Officer Gonzales alleges Mbegbu swatted Officer Johnson's hand, while Officer Johnson alleges it was his arm. (DSOF ¶¶ 23, 24, PSOF ¶ 10). Ngozi and the other civilian eyewitness, Sabinah Odom ("Odom"), who was Ngozi's sister and Mbegbu's sister-in-law, did not recall this pushing and swatting confrontation occurring at all. (PSOF ¶¶ 9, 10). Ngozi did not see Mbegbu punch, push, "sway," or hit the Officers at any time. (PSOF ¶ 91). Odom did not recall Mbegbu getting up from his chair at all before the third officer arrived as backup. (PSOF ¶ 8).

Officer Johnson then told Mbegbu that he was responding to a domestic violence call, and Mbegbu denied that there were any problems and again asked the Officers to leave. (PSOF ¶

65). Specifically, after he sat down, Mbegbu said "Why are you here? Go. Go. Go," with an accompanying hand movement. (PSOF ¶ 66). Officer Johnson asked Mbegbu to stop talking, and Mbegbu did not stop talking. (PSOF ¶ 67). Officer Johnson then "started grabbing" Mbegbu and told him he was under arrest. (PSOF ¶ 68). It was at that point—after Officer Johnson informed Mbegbu that he was under arrest—that physical contact between Mbegbu and Officer Johnson, which was initiated by Officer Johnson, began. (PSOF ¶ 69). Mbegbu asked why he was under arrest, and Officer Johnson said that Mbegbu was raising his voice. (PSOF ¶ 70). Specifically, Mbegbu asked "Why am I under arrest? What have I done? Do you want to kill me? Why are you here? Do you want to shoot me? Why? Leave me alone." (PSOF ¶ 71).

By that point, Officer Gonzales had called for backup, and Officer Zemaitis arrived into the house. (PSOF ¶ 72). At that time, in the living room, Officer Johnson was engaged in physical contact with Mbegbu that began when Officer Johnson told Mbegbu he was under arrest and grabbed his arm. (PSOF ¶ 73). After Officer Zemaitis arrived, he approached Mbegbu as well and joined Officer Johnson in physically restraining Mbegbu. (PSOF ¶ 74).

During this time, Officer Johnson delivered a closed fist strike with his right hand to Mbegbu's face that left him "dazed." (PSOF ¶ 75). Also during this time, Officer Zemaitis tased Mbegbu twice—one eleven second cycle and one six second cycle—using an X2 Taser in dart mode. (PSOF ¶ 76, DSOF ¶ 44). As Mbegbu was being tased, he was saying "Oh, I'm dying. Oh, my God. I'm dying." He also said "My eye. My eye." And "I can't breathe. I'm dying." (PSOF ¶ 79). Officer Zemaitis did not give Mbegbu any advance warning that he was going to use his Taser. (PSOF ¶ 77). Officer Zemaitis only told Mbegbu to get on the ground as he was already in the process of tasing him. (PSOF ¶ 78).

Mbegbu was then thrown on the floor "hard" by the Officers, resulting in him hitting his head on the ground and bleeding "all over the floor." (PSOF ¶ 80). After the second taser cycle occurred and Mbegbu was thrown to the floor, he immediately stopped talking and moving. (PSOF ¶ 82). Nevertheless, Officer Johnson then held him on the floor by his neck by placing a knee to his neck. (PSOF ¶ 83). Officer Johnson also applied pressure to Mbegbu's left mandibular angle on his head for three seconds. (PSOF ¶ 84). Additionally, Officer Weber kept

Mbegbu on his back by placing his knees on Mbegbu's back. (PSOF ¶ 85). Furthermore, Officer Zemaitis bent Mbegbu's legs at the knees and applied pressure to them. (PSOF ¶ 86). While all of these actions were being executed, Mbegbu was not moving, talking, or struggling. (PSOF ¶ 87). The Officers then handcuffed Mbegbu. (PSOF ¶ 88).

The Officers then noticed that Mbegbu appeared to be unconscious. (PSOF ¶ 89). As Defendants set forth in their Statement of Facts, the Officers then rolled Mbegbu to a seated position, removed his handcuffs, and performed CPR after they could not detect breathing. (DSOF ¶¶ 70-83). Mbegbu was transported to the hospital and later pronounced dead. (DSOF ¶ 84).

The Medical Examiner, in his Report based on the autopsy findings and other investigative information, including medical records and police reports, concluded that Mbegbu "sustained a cardiac arrest leading to death that occurred in the setting of acute cyclobenzaprine intoxication, multiple medical problems (including atherosclerotic and hypertensive cardiovascular disease, diabetes mellitus, hepatic steatosis, and hypothyroidism), and law enforcement subdual (including a closed fist strike to the face, the use of a conducted electrical device, prone restraint, and handcuff placement), all of which are known risk factors for cardiac arrest." (PSOF ¶ 94). The Medical Examiner opined that "the manner of death is undetermined, since the above listed risk factors include natural (multiple medical problems) and non-natural (acute cyclobenzaprine intoxication, law enforcement subdual) processes." (PSOF ¶ 95).

**ARGUMENT**

**I. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FRCP 56. At the summary judgment stage, the court's "function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202, 212 (1986). In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id.* at 251-52, 106 S. Ct. at 2512, 91 L. Ed. 2d at 214.

Because Defendants have moved for summary judgment, they have the initial burden of demonstrating the absence of a genuine issue of material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). Furthermore, "the trial court should resolve all reasonable doubts touching the existence of a genuine issue as to a material fact against the moving party." *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). This should be done without making credibility determinations or weighing the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). It is also Defendants' burden to prove they are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir. 2005).

Specifically regarding excessive force claims, because an inquiry into them "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted). Furthermore, "[t]he Ninth Circuit has cautioned that excessive force cases pose 'a particularly difficult problem,' especially where cases involve an in-custody death, because 'the witness most likely to contradict [an officer's] story' is not available to testify." *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1145 (E.D. Cal. 2016) (citing *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir.), *cert. denied sub nom. Wyatt v. F.E.V.*, ___ U.S. ___, 135 S. Ct. 676, 190 L. Ed. 2d 389 (2014)). In these cases, "the evidence should be carefully examined to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* (citations omitted).

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS UNDER 42 U.S.C. § 1983

Defendants claim they are entitled to summary judgment on the claims against them under 42 U.S.C. § 1983 because they did not use excessive force. Defendants do not challenge the existence of state action, but only claim that there is no material factual dispute as to whether they violated Mbegbu's constitutional rights. Specifically, Defendants allege that they did not

use excessive force and that their conduct was objectively reasonable. Because there are material facts in dispute as to whether excessive force was used, summary judgment is inappropriate.

The Fourth Amendment's prohibition on unreasonable seizures sets the applicable constitutional limitation upon the use of force in the course of an arrest or investigatory stop. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989). In determining if a particular use of force was reasonable, the Supreme Court in *Graham* stated that the totality of the circumstances must be evaluated. Specifically, courts should consider the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight, as well as any other relevant factors. *Id.* The "reasonableness" of the use of force must be judged from the perspective of a reasonable officer at the scene and not judged in hindsight. *Id.*

**Severity of the Crime**

The crime at issue in this case, for which Defendants responded to the Mbegbu residence, was domestic violence. When the Officers arrived, Mbegbu and Ngozi were separated, both denied that any domestic violence was occurring or had occurred that evening, and both parties were unarmed. These circumstances did not warrant a conclusion that Mbegbu was a particularly dangerous criminal or that the offense was especially egregious.

This is the same conclusion that the Ninth Circuit reached when faced with similar facts. Evaluating the "severity of the crime" *Graham* factor in a 1983 excessive force claim, the court noted that "[a]lthough we are mindful of the seriousness and reprehensibility of domestic abuse, the circumstances are not such in this case as to warrant the conclusion that Smith was a particularly dangerous criminal or that his offense was especially egregious." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). In that case, the wife had called 911 to report that her husband "'was hitting her and/or was physical with her,' that he had grabbed her breast very hard." *Id.* When the police arrived, the husband was "standing on his porch alone and separated from his wife. He had no guns or weapons in his possession and there were none in the house— and he was clad in his pajamas." *Id.* at 703. The court concluded that "[u]nder these circumstances, the nature of the crime at issue provides little, if any, basis for the officers' use of

physical force." *Id.* In this case, like in *Smith*, the circumstances of the underlying crime provide little to no basis for the officer's use of physical force.

Furthermore, in discussing the severity of the underlying alleged domestic violence crime, Defendants point out that the officers' "safety concerns were real, given that Mbegbu had hit Ngozi just months before over the same dispute (his anger about his son coming home late for work)."[1] This is irrelevant to the analysis at hand, because "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396, 109 S. Ct. at 1872, 104 L. Ed. 2d at 455 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22, 88 S. Ct. 1868, 1879-81, 20 L. Ed. 2d 889, 905 (1968)). Each of the Officers that responded to the scene stated that they did not have any knowledge of Mbegbu or any crimes that he allegedly committed. (DSOF 26). Therefore, the past alleged wrongdoings of Mbegbu, of which the Officers were unaware at the time the force was used, are irrelevant to this analysis.

In discussing this factor, Defendants also allege that "the evidence is undisputed that Mbegbu committed serious felonies under Arizona law, including multiple counts of aggravated assault by aggressively swatting Officer Johnson's hand, kicking Officer Gonzales' shins three times, and kicking Officer Zemaitis in the groin, each act a Class 5 felony." However, that evidence is disputed in multiple ways. First, as to the alleged "swatting," there is a genuine dispute as to whether it occurred at all, as neither civilian eyewitness reported observing this "swatting," although they were both in the room at the time it allegedly occurred. (PSOF ¶ 91). Second, Officer Gonzales reported that Mbegbu swatted at Officer Johnson's hand, while Officer Johnson states it was his arm. (DSOF ¶¶ 8, 9).

Secondly, there are genuine disputes of material facts as to whether Mbegbu ever intentionally kicked any of the Officers such that it would constitute a crime rather than an involuntary reaction or a reasonable defensive response. Odom denied seeing Mbegbu kick any

---

[1] Plaintiffs note that the prior incident concerned Mbegbu's concern about his son coming home late from basketball practices, not "coming home late for work." (Defendants' Motion for Summary Judgment at 11, DSOF ¶ 85).

Officers before he was tased, and that the kick or kicks he executed subsequent to being tased were an involuntary result of the tasing. (PSOF ¶ 92).

The facts surrounding the alleged kicking in this case bear some resemblance to the facts in *Garlick*, 167 F. Supp. 3d 1117, 1148. In that case, which was also at the summary judgment stage, the Court evaluated whether, considering the facts in the light most favorable to the plaintiff, the plaintiff's physical resistance was threatening to the police officers or whether it was merely a "brief response to a pain stimulus." *Id.* The plaintiff alleged that he had not punched, kicked, or verbally threatened the officer and that his only physical response was to "elbow" the officer "in response to the pain stimulus … to try and get [the officer] off of him." The police officer disputed that account, alleging that the plaintiff was "resisting and screaming," was "overpower[ing]" the officer when the officer tried to handcuff the plaintiff, and was choking the police canine involved in the incident. Considering these diverging accounts of the incident in the light most favorable to the plaintiff, the court concluded that "accepting Plaintiffs' facts as true, a reasonable jury could find that, rather than an actual immediate threat, Silva's movements away from Kelly or attempts to get the dog to stop biting him were reasonable defensive responses." *Id.* at 1148.

**Unlawful Presence in Mbegbu Residence at the Time Excessive Force Was Used**

Another factor that should be included in the *Graham* analysis and that is closely tied to the severity of the crime, are the facts underlying the Officers' entry and specifically whether the Officers were lawfully in the Mbegbu residence. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015) (discussing the intersection of unlawful arrest and excessive force claims).

In this case, the analysis of whether the officers used excessive force is greatly affected by the fact that the Officers did not have any right to be in the Mbegbu residence at the time excessive force was used. The Officers did not have a warrant to enter the home, and no exigent circumstances existed that would justify a warrantless entry. Thus, the Officers must rely on consent to enter the home. Although Ngozi consented to the Officers' initial request for entry, Ngozi withdrew this consent by telling the Officers to leave shortly after their arrival. (PSOF ¶¶

53, 59). Furthermore, immediately upon seeing the Officers in his home, Mbegbu repeatedly asked them to leave, making it clear that they did not have his consent to be in his home. (PSOF ¶¶ 56, 58, 60, 65, 66).

Even if a person originally consents to a search or to police officers entering their home, they can withdraw that consent at any time. *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803–04, 114 L. Ed. 2d 297 (1991). In this case, Ngozi recalls that she expressly revoked her consent by telling the Officers: "Leave. He said that you guys should leave. Leave." (PSOF ¶ 59). Under the test of objective reasonableness, the Officers should have understood Ngozi's statement as an express revocation of her consent.

Furthermore, Mbegbu never consented to the Officers' presence in his home, and he made that known to the Officers repeatedly. It is well established that when one spouse or co-tenant consents to police entry into the home he or she shares with the other spouse, and the other spouse does not consent, then consent is "disputed" and is insufficient. *See Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). In *Georgia v. Randolph*, police responded to a domestic dispute and the wife gave the officers her consent to search the marital residence. However, the husband denied consent. Nonetheless, the officers entered and searched the residence. The Supreme Court concluded that one occupant of a dwelling may not give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search. *Id.* at 108. The Court found that this situation presents an issue of "disputed invitation" and consent to enter and search, which "without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114. Thus, even had Ngozi not expressly revoked her consent, the Officers in this case still did not have valid consent to enter and remain in the Mbegbu residence after Mbegbu did not consent. The consent would have been "disputed consent," which is not effective under *Georgia v. Randolph*.

Because the Officers did not have consent to remain in the residence after Ngozi revoked her consent and after Mbegbu refused to consent, their presence at the time that force was used was illegal and in violation of the Mbegbus' Fourth Amendment rights. This strongly undercuts the reasonableness of the Officers' use of force because the Officers were in the residence illegally.

**Immediate Threat**

The second factor in the *Graham* analysis is whether the victim posed an immediate threat to officer's safety. It is well-established that "[a] simple statement by an officer that he fears for his safety or the safety [of] others is not enough; there must be objective factors to justify such a concern." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). Furthermore, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle*, 272 F.3d at 1281. In this case, there are genuine issues of material fact that indicate that a reasonable jury could find that Mbegbu did not pose an immediate threat to officer safety.

When the Officers entered Mbegbu's house, he questioned them as to why they were there and asked them to leave. (PSOF ¶ 56, 58). He also asked if they were there to kill him, which should have indicated a degree of mental disturbance to the Officers. (PSOF ¶ 56). If an officer believes that an individual is mentally disturbed, then they should "have made greater effort to take control of the situation through less intrusive means" than a taser. *Bryan*, 630 F.3d at 829 (9th Cir. 2010). The Ninth Circuit has held that "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Id.* (citing *Deorle*, 272 F.3d at 1282-83). Although the court has declined to "create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals," it found that "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are

confronted ... with a mentally ill individual." *Id.* (citing *Deorle*, 272 F.3d at 1282-83).

Although Mbegbu was asking the Officers why they were in his house and to leave, Mbegbu never verbally threatened the Officers. As for physical threats or resistance, Mbegbu followed the Officers' instructions to sit back down after they approached him and he stood up. (PSOF ¶ 63, 64). There is a genuine dispute as to whether Mbegbu ever "swatted" at Officer Johnson's hand or arm, which is a fact material to the analysis of whether Mbegbu presented an immediate threat to the Officers. (PSOF ¶¶ 8,9). Furthermore, Mbegbu was not armed. After he sat back down at the Officers' request, he stayed seated, not advancing on the Officers or physically or verbally threatening them.

**Active Resistance and Attempt to Evade Arrest**

The third *Graham* factor is whether the victim was actively resisting arrest or attempting to evade arrest by flight. In this case, it is undisputed that Mbegbu did not attempt to evade arrest by flight. However, the evidence in this case raises a genuine issue of material fact as to whether Mbegbu was actively resisting arrest.

The Ninth Circuit has drawn a distinction between "passive" and "active" resistance; however, it has cautioned that resistance "should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer. We must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case." *Bryan*, 630 F.3d at 830. In this case, Plaintiffs assert that Mbegbu's only resistance was passive.

In this case, it is undisputed that Mbegbu ignored the Officers' request to him to stop talking, but that he did sit back down when the Officers asked him to. (PSOF ¶¶ 64, 67). A refusal to follow an officer's commands is a form of passive resistance. *See Bryan*, 630 F.3d at 830. As discussed above, whether Mbegbu "swatted" at the arm or hand of an Officer is disputed. Furthermore, the degree to which Mbegbu resisted arrest after he sat back down is disputed. Defendants allege that Mbegbu, at various times before he was tased, "jerked violently, splashing a cup of hot liquid all over Officers Gonzales and Zemaitis," "tensed his body" and "flailed his arms around," and "kicked his

legs at the Officers to prevent them from arresting him." (DSOF ¶¶ 36, 37, 38). However, these facts are disputed. Odom stated that Mbegbu did not kick any Officers until he had been tased, at which time his kick was involuntary, while Ngozi was unsure if Mbegbu kicked any Officers. (PSOF ¶ 92). Neither Odom nor Ngozi recalled Mbegbu standing up, tensing his body, and flailing his arms. As to the cup of hot liquid, Ngozi recalled that it was spilled when Mbegbu's leg upended the table as the Officers were taking him to the ground, not that he was holding and spilled it on the Officers. (PSOF ¶ 16). Thus, the alleged active acts of resistance that occurred before the closed hand strike and taser use are disputed. Viewing the evidence in the light most favorable to Plaintiffs at this stage in the proceedings, it is clear that Mbegbu only passively resisted the Officers.

In arguing that Mbegbu was actively resisting arrest such that their use of force against him was justified, Defendants use as justification events that occurred *after* much of the alleged force had already been exercised. For example, Defendants allege that Mbegbu "stood up and refused commands to get back down after the Taser use," tensed his arms and pinned them beneath his body to avoid handcuffing, refused commands to place his hands behind his back, rolled his body to try and stand up again, and kicked at the Officers even after he was handcuffed. (DSOF ¶¶ 56-66). All of these actions allegedly occurred after the closed fist strike and two taser uses, and therefore cannot be used as justification for those uses of force.

Furthermore, whether those events occurred at all are disputed by Ngozi and Odom, who allege that Mbegbu did not talk, resist, kick, or otherwise move after he was brought to the ground following the second taser cycle. (PSOF ¶¶ 82, 87). They recall him saying that he was dying and "My eye! My eye!" when he was being tased, but maintain that he was not moving, resisting, talking, or kicking after he was brought to the ground, save for any involuntary muscle movements that resulted from the tasing. (PSOF ¶¶ 79, 82, 87). Therefore, assuming *inter alia* that those events are forms of active resistance that could possibly justify subsequent uses of force, they are disputed.

**Lack of Warning**

An additional consideration in determining if the force used by the Officers was

reasonable is whether or not Mbegbu was warned that he would be tased if he did not comply with the Officers' requests. In *Bryan*, 630 F.3d 805, 831, the Ninth Circuit found that it was appropriate to consider whether the victim had been warned that he would be tased in determining if the force used by the police was reasonable. Citing *Deorle*, 272 F.3d at 1283, the court observed that "police officers normally provide such warnings where feasible, even when the force is less than deadly, and that the failure to give such a warning is a factor to consider." *Bryan*, 630 F.3d at 831. The court found that "it was feasible to give a warning that the use of force was imminent if Bryan did not comply," and that this "militate[s] against finding Officer MacPherson's use of force reasonable." *Id.*

In *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013), the Ninth Circuit again recognized the importance of the police giving a warning "of the imminent use of force" and that the absence of that warning "weighs in favor of finding a constitutional violation." In *Gravelet-Blondin*, the police officer began to warn the victim that he would be tased if he did not leave, but fired his taser before he had finished giving the warning. The court found that that timing left the victim "no time to react and render[ed] the warning meaningless." *Id.* Lastly, in *Mattos v. Agarano*, 661 F.3d 433, 451 (9th Cir. 2011), the Ninth Circuit found that "the fact that Aikala gave no warning to Jayzel before tasing her pushes this use of force far beyond the pale" and concluded that this failure to warn weighed in favor of finding a constitutional violation.

In the present case, Officer Zemaitis gave no advance warning that he was going to shoot his taser at Mbegbu. (PSOF ¶ 77). Officer Johnson was not even aware that Officer Zemaitis was going to use his taser until he heard the taser "pop" as Officer Zemaitis disengaged it. (PSOF ¶ 77). Furthermore, Officer Zemaitis did not tell Mbegbu to get on the ground until he was already shooting the taser. (PSOF ¶ 78). Thus, this warning, like the warning in *Gravelet-Blondin*, was ineffective. It is clear that the fact that Officer Zemaitis did not warn Mbegbu that he would use the taser favors a finding of unreasonable use of force by the Officers.

**Quantum of Force**

In discussing the quantum of force used, Defendants allege that, in the Ninth Circuit, officers "need not avail themselves of the least intrusive method of responding to an exigent

13

situation, they need only act within that range of conduct we identify as reasonable." (Defendants' Motion for Summary Judgment at 13 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994))). While that may be true, "police are required to consider '[w]hat other tactics if any were available' to effect the arrest," and this is a factor that courts consider in determining if the force used was reasonable as part of a 1983 claim. *Bryan*, 630 F.3d at 831 (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000)). *See also Smith*, 394 F.3d at 703 ("an additional factor that we may consider in our *Graham* analysis is the availability of alternative methods of capturing or subduing a suspect.") In *Bryan*, the court found that the fact that the officer "did not consider less intrusive means of effecting Bryan's arrest" factored "significantly" in their *Graham* analysis. Here, there are questions of material fact as to whether less intrusive means were available, making summary judgment inappropriate.

**Medical Causation**

In arguing that the Officers did not use excessive force, Defendants devote a section of their argument claiming that Plaintiffs cannot establish medical causation. Medical causation is irrelevant to that analysis of whether the force used by the Officers in punching, tasing, and physically restraining Mbegbu was objectively reasonable. Section 1983 excessive force claims hinge on the force the officers used at the time, and are not contingent on proof of medical causation between the force and any resulting medical issues or death. *See Graham*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443.

**Officer Gonzales' Involvement**

Defendants also argue that because they believe that Officer Gonzales did not directly tase, hit, or restrain Mbegbu, she did not use excessive force against him and thus summary judgment should be entered in her favor on the excessive force claims. As alleged by Plaintiffs in their Complaint, Officer Gonzales can still be held liable for failing to intervene when her fellow Officers violated Mbegbu's constitutional rights. *See Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen."). Whether this duty exists depends on whether

the officer had a "realistic opportunity" to intercede. *Id.* at 1289. This is a factual inquiry that involves disputed facts in this case, and thus summary judgment as to Officer Gonzales on this point should be denied.

Overall, this is not one of those rare cases where summary judgment is warranted on an excessive force claim. In this case, there are material facts in dispute that make summary judgment inappropriate. An application of the *Graham* factors is impossible at this stage, because this case is fraught with disputed facts. Looking at those facts in the light most favorable to Plaintiffs, it is not clear that Defendants are entitled to judgment as a matter of law. Specifically, the reports of the eyewitnesses and the reports of the Officers differ in several important respects. Furthermore, balancing all of the circumstances in this case, the question of whether the Defendants used reasonable force against the Plaintiff is clearly a question that must be left for the jury.

### III. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants' qualified immunity claim attempts to bootstrap upon the argument that no deprivation of any constitutional right occurred. But the above demonstrates that there is a question of fact as to whether the Officers employed unreasonable force in connection with the incident at the Mbegbu house. The first step in a qualified immunity analysis is determining "whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003). Because, for the purposes of summary judgment, Plaintiffs have established a violation of a constitutional right as discussed *supra*, it is appropriate to turn to the second step: whether the conduct of the Officers violated a clearly established right of the Plaintiffs and the decedent. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666, 678 (2002). However, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741, 122 S. Ct. at 2516, 153 L. Ed. 2d at 679. The Ninth Circuit has noted

they are "particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact-specific inquiry. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011).

In this case, the Officers are not, as a matter of law, entitled to the protection of qualified immunity. Prior to the date of this incident, clearly established case law existed that gave Defendants fair notice that using the force at issue here—a closed fist strike, tasing, and the use of further restraints on Mbegbu once he was prone and on the ground—would be unconstitutional. As discussed above, Mbegbu was engaged in only passive resistance. The Ninth Circuit has held that "[t]he right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008," and thus was clearly established when this incident occurred in 2014. *Gravelet-Blondin*, 728 F.3d at 1093. *See also Garlick*, 167 F. Supp. 3d at 1154. A closed fist strike, taser use, and further restraints on a prone subject are each non-trivial applications of force. *See Bryan*, 630 F.3d at 809 (tasers, used in dart mode, "constitute an intermediate, significant level of force that must be justified by the governmental interest involved"); *Garlick*, 167 F. Supp. 3d at 1154 (finding that impact blows constitute non-trivial force, the right to be free from which is clearly established); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003) (finding that prolonged use of body weight application on a prone subject constituted excessive force).

Further, Defendants are not entitled to qualified immunity because they violated Mbegbu's clear and established Fourth Amendment right to be free from warrantless searches and seizures in his home, a right of which a reasonable officer would have known. As discussed above in Section II and considering the facts in the light most favorable to Plaintiffs, Defendants remained in the Mbegbu residence without Mbegbu's consent, a violation of the Fourth Amendment. The Officers did not have a warrant to enter the residence, and they lacked consent to be in the house at the time the excessive force was used for two reasons. First, Ngozi validly and expressly revoked her consent shortly after the Officers entered the home. (PSOF ¶ 59). Second, Mbegbu never gave his consent to the Officers' presence in his house, and expressly instructed them to leave. (PSOF ¶¶ 56, 58, 65, 66).

A reasonable officer should have interpreted the Mbegbus' statements to understand that they had no consent to be in the house. Further, a reasonable officer should have known that, absent consent or a warrant, remaining in the house constitutes a violation of Mbegbu's Fourth Amendment rights. It is well-established and was the law long before the time of this incident that a person can revoke their consent to officers' entry into their home. *See e.g. United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006). Furthermore, as discussed above, the rule regarding "disputed consent" in a situation where one spouse consents to entry and the other does not has been established since 2005. *See Georgia v. Randolph*, 547 U.S. 103, 104, 126 S. Ct. 1515, 1517, 164 L. Ed. 2d 208 (2006). Thus, the rights violated by the Officers were clearly established, and the Officers are not entitled to qualified immunity.

Alternatively, Plaintiffs asset that there are material facts in dispute that would make a determination of qualified immunity at this stage of the proceedings premature. The Ninth Circuit has held that "[i]f a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). For these reasons, Defendants' Motion for Summary Judgment should be denied in this respect.

## IV. DEFENDANTS ARE NOT ENTITLED TO JUDGMENT ON PLAINTIFFS' FOURTEENTH AMENDMENT LOSS OF FAMILIAL RELATIONSHIP CLAIM

As discussed *supra*, Defendants are not entitled to summary judgment on Plaintiffs excessive force claims. Therefore, Plaintiffs can proceed with their Fourteenth Amendment loss of familial relationship claim, which is a substantive due process claim. In this case, Plaintiffs have stated a claim that Defendants' actions "shock the conscience" by showing that the Officers acted with deliberate indifference, the applicable standard here. *See Tatum v. Moody*, 768 F.3d 806, 820-21 (9th Cir. 2014). The "deliberate indifference standard," as opposed to the "purpose to harm" standard, applies in this case because actual deliberation was practical. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

In this case, it is clear that actual deliberation was practical. At one point, the Officers conferred amongst themselves and decided to wait until a backup officer arrived to arrest

Mbegbu. (DSOF 29). They then conferred with the backup officer about arresting Mbegbu. (DSOF 34). Nonetheless, they chose to effectuate his arrest through multiple applications of different types of substantial force, including a closed fist strike to the face, taser applications, and various body-weight restraints on Mbegbu, who was in a prone position. Furthermore, once Mbegbu was lying on the ground, not moving, the situation had de-escalated such that Defendants could determine whether further restraint was necessary.

At the very least, there are facts in dispute that affect which standard applies. A court can only decide which standard applies on summary judgment if "the undisputed facts point to one standard or the other." *Garlick*, 167 F. Supp. 3d at 1165 (citations omitted). Furthermore, by its nature, "the determination of which situation [the officer] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards." *Id.* Therefore, in this case, should the court not determine that the "deliberate indifference standard" applies, the court should deny summary judgment because they are genuine issues of material fact that affect which standard should apply to Plaintiffs' claim.

## V. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' WRONGFUL DEATH CLAIM

As discussed above, there are genuine issues of material fact as to whether the force used by Defendants was excessive, and thus summary judgment on Plaintiffs' wrongful death claim would be inappropriate. Specifically, there are material facts in dispute regarding each of the elements of Plaintiffs' claim. What duty the Officers owed to Mbegbu and whether they breached it are both disputed. Defendants argue that they did not use excessive force, while Plaintiffs argue they did. Furthermore, causation is disputed. The Medical Examiner's Report lists "law enforcement subdual" as a contributing factor to Mbegbu's death and finds that the manner of death is undetermined, while Defendants argue that Mbegbu's death was not caused by law enforcement subdual. (PSOF ¶¶ 94, 95).

## VI. PLAINTIFFS ARE NOT PRECLUDED FROM OBTAINING DAMAGES FOR PRE-DEATH PAIN AND SUFFERING UNDER ARIZONA'S SURVIVAL STATUTES

Under the applicable law, Plaintiffs' actions for civil rights violations and wrongful death are not subject to the state survival statute. Arizona's survival statute states that "[e]very cause of action … shall survive the death of the person entitled thereto or liable therefor, and may be asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed." Ariz. Rev. Stat. Ann. § 14-3110.

Defendants claim that this statute prohibits recovery for pre-death pain and suffering in this case, because the excessive force did not "cause" the death, citing *Fernandez v. Virgillo*, 651 F. App'x. 692 (9th Cir. 2016). Defendants mischaracterize the law in this area, specifically the requirement that the death be "caused" by or result from the civil rights violation. This Court discussed the application of survival statutes to 1983 actions at great length in *Gotbaum v. City of Phoenix*, 617 F. Supp. 2d 878, 881 (D. Ariz. 2008). In that case, the court was presented with the question of whether pre-death pain and suffering of the decedent could be recovered under 1983 despite the existence of Arizona's survival statute, quoted *supra*. The court concluded that "application of the Arizona survival statute and its elimination of pain and suffering damages in cases where death is alleged would be contrary to the purposes of section 1983." *Id.* at 885. In *Gotbaum*, the decedent died while alone and restrained in a holding cell at the Sky Harbor Airport after being placed there in custody by the Phoenix Police Department. While in the holding cell, Gotbaum became unconscious, and was later found there with her hands under her chin and her leg iron chain across her neck. The police were not able to resuscitate Gotbaum and she died. The court in *Gotbaum* concluded that, under the applicable law and the facts of the case, the Arizona survival statute did not prohibit her estate from obtaining damages for pre-death pain and suffering. *Id.* at 885.

Survival statutes prohibit recovery of pre-death pain and suffering when the death is unrelated to the incident from which the civil rights violation stems. However, medical causation is not required. Thus, Arizona's survival statute does not prohibit recovery for pre-death pain for excessive force in this case, as Defendants allege, assuming *inter alia* that medical causation was not established.

## VII. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF PUNITIVE DAMAGES

As discussed above, this case is fraught with material facts that are in dispute. Because some of these disputed facts affect the analysis of whether punitive damages are available to Plaintiffs, summary judgment on this issue should be denied.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that this Court deny Defendants' Motion for Summary Judgment.

RESPECTFULLY SUBMITTED this 2nd day of June 2017.

THE MEGWA LAW OFFICE

By /s/ Sabinus A. Megwa
Sabinus A. Megwa
The Megwa Law Office
6811 South Central Avenue
Phoenix, Arizona 85042
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kathleen Wieneke     kwieneke@swlfirm.com
Christina Retts     cretts@swlfirm.com

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Sabinus A. Megwa