SABINUS A. MEGWA, ESQ.
The Megwa Law Office
6811 South Central Ave
Phoenix, Arizona 85042
Telephone: (602) 243-6151
State Bar Number: 011266

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Ngozi Mbegbu, individually as the surviving spouse of decedent Balantine Mbegbu and on behalf of decedent's children Ogechukwu Amarachukwu Gloria Mbegbu and C.C.E.M. (a minor) as the statutory beneficiaries of Balantine Mbegbu; and as Personal Representative of the Estate of Balantine Mbegbu,<br><br>       Plaintiffs<br><br>v.<br><br>City of Phoenix, et al.,<br>       Defendants. | No. 2:16-cv-00424-DGC<br><br>**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS AND SEPARATE STATEMENT OF FACTS IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs Ngozi Mbegbu, individually as the surviving spouse of decedent Balantine Mbegbu and on behalf of decedent's children Ogechukwu Amarachukwu Gloria Mbegbu and C.C.E.M. (a minor) as the statutory beneficiaries of Balantine Mbegbu and as Personal Representative of the Estate of Balantine Mbegbu ("Plaintiffs"), by and through their attorney undersigned, submit this Controverting Statement of Facts and Separate Statement of Facts in support of their Responsive Memorandum in Opposition to Defendants' Motion for Summary Judgment.

**I. Controverting Statement of Facts**

1. Plaintiffs do not dispute paragraphs 1 through 11.

2. With respect to paragraph 12, Plaintiffs clarify that it is Officer Gonzales' opinion that Ngozi Mbegbu ("Ngozi"), decedent Balantine Mbegbu's ("Mbegbu") wife, speaks with a "thick accent" and Officer Johnson's opinion that she speaks in "broken English." (Defendants' Ex. 4. at COP_BM0145). Further, Plaintiffs dispute that it was Ngozi's idea that the Officers enter the house. Ngozi recalls that the Officers first asked her if they could enter the house to speak with Mbegbu and she merely assented to their request. (Plaintiffs' Ex. 1 at 55:8-9).

3. Plaintiffs do not dispute paragraphs 13 through 15.

4. With respect to paragraph 16, Plaintiffs deny that Mbegbu "became furious and jumped from his chair, yelling." According to eyewitness Sabinah Odom ("Odom"), Mbegbu's sister-in-law and Ngozi's sister, Mbegbu remained seated when the first two Officers entered the room and did not get up until the third Officer entered. (Plaintiffs' Ex. 2 at 13:23-25; 14:1-17). Ngozi recalled that once the Officers advanced toward Mbegbu, he did get up but promptly sat back down at the Officers' request. (Plaintiffs' Ex. 1 at 48:20-24; 55:20-24; 93:4-14). Additionally, Odom recalls that Mbegbu was not yelling. (Plaintiffs' Ex. 2 at 12:19-25; 13:1-4). Although he was stammering and "his voice [was] high," Odom maintains that Mbegbu was not yelling and Ngozi testified that when her husband was talking normally, it sounded like he was angry because of his stammer. (Plaintiffs' Ex. 2 at 12:20-22; Plaintiffs' Ex. 1 at 67:15-68:1). Ngozi also recalled that Mbegbu's voice was "high" and when asked if he was "sounding angry in his voice," Ngozi responded "kind of." (Plaintiffs' Ex. 1 at 55:15-20; 61: 6-9). Lastly, in Odom's opinion, Mbegbu was not angry. (Plaintiffs' Ex. 2 at 13:6-12).

5. As to Paragraph 17, Plaintiffs clarify that the statement that Mbegbu yelled at a volume of "10" on a scale of one to 10 is Officer Johnson's opinion. (Defendants' Ex. 4 at COP_BM000181). Odom's opinion was that Mbegbu was not yelling. (Plaintiffs' Ex. 2 at 12:19-22).

6. As to Paragraph 18, Plaintiffs clarify that it was Ngozi's opinion that Mbegbu's voice sounded very angry. Odom's opinion is that Mbegbu was not angry. (Plaintiffs' Ex. 2 at 13:6-12).

7. Plaintiffs do not dispute paragraph 19.

8. As to paragraph 20, Plaintiffs deny that Mbegbu approached the Officers and came within six to eight inches of Officer Johnson's face. Odom stated that Mbegbu did not get up from his chair until the third Officer arrived, after this incident purportedly occurred. (Plaintiffs' Ex. 2 13:23-14:17). Ngozi recalled that once the Officers advanced toward Mbegbu, he did get up but promptly sat back down at the Officers' request. (Plaintiffs' Ex. 1 at 48:20-24; 55:20-24; 93:4-14).

9. As to paragraphs 21 and 22, Plaintiffs dispute that the events detailed therein occurred because neither civilian eyewitness recalled seeing them occur.

10. As to paragraph 23, Plaintiffs dispute that the events detailed therein occurred because neither civilian eyewitness recalled seeing them occur. Further, Plaintiffs dispute that any swatting motion that may have occurred affected Officer Johnson's arm, as Officer Gonzales recalled that Mbegbu "swatted at Johnson's hand," not his arm. (Defendants' Ex. 4 at COP_BM000147).

11. In paragraph 24, because Plaintiffs dispute that Mbegbu "swatted" Officer Johnson's hand or arm, they subsequently dispute that he committed any crime related thereto.

12. Plaintiffs do not dispute paragraph 25, although they note that it is simply Officer Johnson's opinion, not a fact.

13. Plaintiffs dispute paragraph 26 in that the degree to which Mbegbu was larger, bigger, and heavier than the Officers varies depending on which Officer Mbegbu was compared to, and Mbegbu was not "much larger, bigger, [and] heavier" than all of the Officers. (Plaintiffs' Ex. 1 at 60:1-61:5). Further, the evidence cited by Defendants does not support the conclusion that Mbegbu was "stronger" than the Officers.

14. Plaintiffs do not dispute paragraph 27, although they note that it is simply Officer Johnson's opinion, not a fact.

15. Plaintiffs do not dispute paragraphs 28 through 35.

16. In paragraph 36, Plaintiffs dispute that Mbegbu jerked violently and spilled a cup of hot liquid over the Officers. Ngozi recalled that the cup of hot liquid, which was tea, was spilled when Mbegbu's leg caught the table and upended it while he was being taken to the ground by

the Officers. (Plaintiffs' Ex. 1 at 77:19-24). Ngozi also recalled that during the period when he was seated, Mbegbu picked up a different cup full of water that was not hot and tried to drink from it, but one of the Officers took it from him and threw it. (Plaintiffs' Ex. 1 at 84:13-85:15; 86:1-12).

17. As to paragraph 37, Plaintiffs dispute that the events detailed therein occurred because neither civilian eyewitness recalled seeing them occur.

18. As to paragraphs 38-40, Plaintiffs dispute that Mbegbu kicked any Officers before he was tased. Odom did not observe Mbegbu kicking any Officers before he was tased. (Plaintiffs' Ex. 2 at 26:16-18). Ngozi was unsure if Mbegbu kicked any Officers. (Plaintiffs' Ex. 1 at 86:17-24).

19. Plaintiffs do not dispute paragraphs 41-42.

20. As to paragraph 43, Plaintiffs dispute that Mbegbu was struggling and resisting arrest. Odom stated that Mbegbu was not struggling with the Officers. (Plaintiffs' Ex. 2 at 43:21-23; 25:24-25; 26:1-9).

21. Plaintiffs do not dispute paragraphs 44-47.

22. As to paragraph 48, to the extent that Plaintiffs assert that Mbegbu was not kicking the Officers before he was tased, Plaintiffs dispute that he "continued" kicking at the Officers. (Plaintiffs' Ex. 2 at 26:16-18).

23. As to paragraph 49, Plaintiffs dispute that the events detailed therein occurred because neither civilian eyewitness recalled seeing them occur.

24. Plaintiffs do not dispute paragraph 50.

25. As to paragraph 51, Plaintiffs dispute that the events detailed therein occurred because neither civilian eyewitness recalled seeing them occur.

26. Plaintiffs do not dispute paragraphs 52-55.

27. As to paragraphs 56, 57, 59, 61, 62, 63, 64, 65, and 66, Plaintiffs dispute that Mbegbu continued to resist, kick, or otherwise move after he was tased and brought to the ground. Ngozi recalled that after Mbegbu was tased, brought to the ground, and declared that he was dying, he was no longer moving, talking, or struggling. (Plaintiffs' Ex. 1 at 89:4-6; 97:17-25).

28. Plaintiffs do not dispute paragraphs 58 and 60.

29. Plaintiffs do not dispute paragraphs 67 through 84.

30. Plaintiffs dispute the relevance of paragraphs 85, 86, 87, 88, 89, 91, 92, and 93 to the Motion for Summary Judgment. Because the Officers had no knowledge of Mbegbu at all, let alone his temperament or past issues allegedly caused by anger, these statements are not relevant to the issues presented in Defendants' motion. (Defendants' Ex. 4 at COP_BM000144). Specifically, when asked if they had any prior contact or knowledge of Mbegbu, all four Officers responded in the negative. (*Id.*, COP_BM000178, COP_BM000219, COP_BM000239).

31. Plaintiffs do not dispute paragraphs 90, 94, 95, 96, 97, and 105.

32. To the extent that paragraphs 98, 100, 101, 102, 103, 104, and 106 represent the opinions of medical experts, Plaintiffs do not dispute that these are the opinions held by these experts. However, Plaintiffs do not agree that these opinions are accurate or correct.

33. Plaintiffs do not dispute paragraphs 108 through 110.

34. To the extent that paragraph 111 represents the opinion of an expert, Plaintiffs do not dispute that the paragraph represents the expert's opinion. However, Plaintiffs do not agree that this opinion is accurate or correct.

35. Plaintiffs do not dispute paragraph 112

36. In paragraph 113, Plaintiffs dispute that Odom admitted that Mbegbu "pulled away when Officers Johnson and Zemaitis tried to arrest him, flailed his arms with closed fists and kicked the Officers, and physically struggled with them to resist arrest." The portion of Odom's deposition cited by Defendants only indicates that Odom saw Mbegbu kick an Officer after he was tased, and she stated that the kick was not intentional. (Plaintiffs' Ex. 2 at 54:19-25; 56:1-24).

37. Plaintiffs do not dispute paragraph 114.

38. In paragraph 115, Plaintiffs dispute the conclusion that "Officers Zemaitis and Weber … look nothing alike." This statement appears to be the opinion of Defendants' counsel and is not a fact supported by any evidence in the record. Although Defendants cite the photographs of these Officers, any conclusion as to the similarities in their appearances is an opinion and an inappropriate interjection of counsel's opinion into a statement of facts.

39. Plaintiffs do not dispute paragraphs 116 through 118.

40. In paragraph 119, Plaintiffs dispute that Ngozi was too confused to "see anything." The cited portion of the record indicates that Ngozi's statement that her "eye was full of the tears and confusion" only modifies her statement regarding "how [the officer holding the Taser] looked."

41. In paragraph 120, Plaintiffs dispute that Odom's cited statement supports Defendants' conclusion that Odom was "unable to see Mbegbu clearly from where she was standing during the incident." Her statement appears to apply only to the time period after "the officers told [her] and [her] sister, Ngozi to stay back." (Plaintiffs' Ex. 2 at 53:8-19). Officer Gonzales recalled that she told Ngozi and Odom to "scoot back" after the taser had been deployed. (Defendants' Ex. 4 at COP_BM 000148-149). Therefore, Plaintiffs dispute that Odom testified that she was unable to see Mbegbu "during the incident" as a whole.

42. Plaintiffs dispute paragraph 121 in that Odom testified that Mbegbu "didn't struggle" and that "there was no struggle." (Plaintiffs' Ex. 2 at 25:24-25; 26:9). Her statement that she "did not see" because of her body shivering responded only to the question "Did you see him moving his body around like he did not want to be arrested?" (Plaintiffs' Ex. 2 at 26:13-15). The question Odom responded to did not include a purpose—to resist arrest—and did not mention struggling.

43. As to paragraph 122, Plaintiffs dispute that the cited portion of Odom's testimony indicates that she saw Mbegbu kick and hit one of the Officers with his leg *before* the taser was deployed. The question asked in the cited testimony was "Did you see Balantine hit any of the officers?" and Odom's response was "The time he hit his leg is the time they Taser him, and he make like this." (Plaintiffs' Ex. 2 at 26:16-18). Defendants' counsel then asked a follow up question, "And when he was being Tasered, he hit one of the officers with his leg?," to which Odom replied, "He – he just hit his leg like this. 'I'm dying. I'm dying.'" (Plaintiffs' Ex. 2 at 26:19-22). Odom was later asked to "Explain what you mean by he kicked the officer," and she stated that it was "because it was the time they Taser him, he kicked like this," that " – they were not fighting. They just – because of that Taser, he wanted to get himself – he made like this," and that "he did not intentionally did it." (Plaintiffs' Ex. 2 at 54:23-24; 55:4, 55:19, 55:22-24).

Therefore, Plaintiffs dispute the statement that Odom saw Mbegbu kick or hit an Officer before he was tased.

44. Plaintiffs do not dispute paragraph 123.

45. In paragraph 124, Plaintiffs clarify that Ngozi and Odom only left the house and went to the courtyard after Mbegbu had been tased twice and brought to the ground. (Defendants' Ex. 4 at COP_BM000242, COP_BM000149). Up until that point, Ngozi and Odom were inside the house. Specifically, Ngozi was standing in the room with the Officers and then in the kitchen until she was asked to leave the house. (Plaintiffs' Ex. 1 at 57:12; 63:19-22). Ngozi and Odom were still standing in the living room when Officer Weber arrived, which was at the time the Taser was being deployed. (Defendants' Ex. 4 at COP_BM000218, 220).

46. In paragraph 125, Plaintiffs dispute that Odom's cited statement supports Defendants' conclusion that Odom was "unable to see Mbegbu clearly from where she was standing during the incident." Her statement appears to apply only to the time period after "the officers told [her] and [her] sister, Ngozi to stay back." (Plaintiffs' Ex. 2 at 53:8-19). Officer Gonzales recalled that she told to Ngozi and Odom to "scoot back" after the taser had been deployed. (Defendants' Ex. 4 at COP_BM 000148-149). Therefore, Plaintiffs dispute that Odom testified that she was unable to see Mbegbu "during the incident" as a whole.

47. Plaintiffs do not dispute paragraph 126.

48. Plaintiffs dispute the relevance of paragraph 127 to the Motion for Summary Judgment. Because the Officers had no knowledge of Mbegbu at all, let alone his temperament or past issues allegedly caused by anger, these statements are not relevant to the issues presented in Defendants' motion. (Defendants' Ex. 4 at COP_BM000144). Specifically, when asked if they had any prior contact or knowledge of Mbegbu, all four Officers responded in the negative. (*Id.*, COP_BM000178, COP_BM000219, COP_BM000239).

49. Plaintiffs dispute paragraph 128 in that it fails to clarify that the kick Odom saw occurred after Mbegbu was tased, and was, in Odom's opinion, involuntary, as discussed in paragraph 43 of this Controverting Statement of Facts.

50. As to paragraph 129, Plaintiffs clarify that Odom saw the incident through the tasing, after which she was asked to leave and go to the courtyard. (Defendants' Ex. 4 at COP_BM000242, COP_BM000149).

51. Plaintiffs do not dispute paragraphs 130 and 131.

## II. Plaintiffs' Statement of Facts

52. Plaintiffs adopt Defendants' Statement of Facts regarding Geralds' 911 call and the Officers' arrival to the Mbegbu's residence set forth in Plaintiffs' Statement of Facts paragraphs 1-11.

53. After the Officers established who Ngozi was and asked her about her husband, they asked to see Mbegbu and Ngozi assented. (Plaintiffs' Ex. 1 at 55:8-9).

54. When Ngozi went to enter the house, the Officers followed her and entered the house before her. (Plaintiffs' Ex. 1 at 55:13-16).

55. Mbegbu was seated in a chair in the living room when the Officers entered his home. (Defendants' Ex. 4 at COP_BM000146).

56. Upon seeing the Officers, Mbegbu asked them to leave and if they were there to kill him, however, Mbegbu did not in any way verbally threaten the Officers. (Plaintiffs' Ex. 1 at 59:8-12; 55:16-22).

57. Officer Gonzales did not recall Mbegbu making any verbal threats against the Officers. (Defendants' Ex. 4 at COP_BM000163).

58. Immediately upon seeing the Officers in his home, Mbegbu told the officers to leave, saying "I say you should leave my house. Go." (Plaintiffs' Ex. 1 at 50:10-12).

59. Once Ngozi heard that, she asked the Officers to leave as well, telling them "Leave. He said that you guys should leave. Leave." (Plaintiffs' Ex. 1 at 61:10-14).

60. Officer Gonzales recalled Mbegbu telling the Officers that they "should not be in his home." (Defendants' Ex. 4 at COP_BM000160).

61. Mbegbu, who had a stammer, spoke in his normal voice, which some people may think is yelling due to his stammer that makes his voice "high," however, he was not yelling. (Plaintiffs' Ex. 2 at 12:9-13:4; Plaintiffs' Ex. 1 at 67:15-68:1; Plaintiffs' Ex. 1 at 55:15-20).

62. The Officers did not answer Mbegbu when he asked why they were there and asked them to leave. (Plaintiffs' Ex. 1 at 55:21).

63. The Officers advanced toward Mbegbu and Mbegbu got up from his chair. (Plaintiffs' Ex. 1 at 48:20-22).

64. The Officers told Mbegbu to sit down and he complied. (Plaintiffs' Ex. 1 at 48:23-24; 55:22-24).

65. Officer Johnson told Mbegbu that he was there responding to a domestic violence call, and Mbegbu denied that there were any problems and again asked the Officers to leave. (Plaintiffs' Ex. 1 at 55:14-56:1; 57:1-4).

66. Specifically, after he sat down, Mbegbu said "Why are you here? Go. Go. Go," with an accompanying hand movement. (Plaintiffs' Ex. 1 at 59:15-17).

67. Officer Johnson then asked Mbegbu to stop talking, and Mbegbu did not stop talking. (Plaintiffs' Ex. 1 at 76:9-17).

68. Officer Johnson then "started grabbing" Mbegbu and told him he was under arrest. (Plaintiffs' Ex. 1 at 56:5-12; 76:13-17; 48:10-12; 56:23-25; 57:1-8; 82:4-8).

69. It was at that point—after Officer Johnson informed Mbegbu that he was under arrest—that physical contact between Mbegbu and Officer Johnson, which was initiated by Officer Johnson, began. (Plaintiffs' Ex. 1 at 82:6-9)

70. Mbegbu asked why he was under arrest, and Officer Johnson said that Mbegbu was raising his voice. (Plaintiffs' Ex. 1 at 56:5-12).

71. Specifically, Mbegbu asked "Why am I under arrest? What have I done? Do you want to kill me? Why are you here? Do you want to shoot me? Why? Leave me alone." (Plaintiffs' Ex. 1 at 56:5-13).

72. By that point, Officer Gonzales had called for backup, and Officer Zemaitis arrived into the house. (Plaintiffs' Ex. 1 at 76:20-21).

73. In the living room, Officer Johnson was engaged in physical contact with Mbegbu that began when Officer Johnson told Mbegbu he was under arrest and grabbed his arm. (Plaintiffs' Ex. 1 at 77:11-24).

74. After Officer Zemaitis arrived, he approached Mbegbu as well and joined Officer Johnson in physically restraining Mbegbu. (Plaintiffs' Ex. 1 at 59:22-25).

75. During this time, Officer Johnson delivered a closed fist strike with his right hand to Mbegbu's face that left him "dazed." (Defendants' Ex. 4 at COP_BM000124, COP_BM000195).

76. Also during this time, Officer Zemaitis tased Mbegbu twice—one eleven second cycle and one six second cycle. (Defendants' Ex. 4 at COP_BM000124-125).

77. Officer Zemaitis did not give Mbegbu any warning that he was going to deploy the taser—in fact, even the other Officers present did not know that Officer Zemaitis was going to use his taser until they heard it "pop" as Officer Zemaitis disengaged it. (Defendants' Ex. 4 at COP_BM000196, COP_BM000241)

78. Officer Zemaitis told Mbegbu to get on the ground as he was deploying the taser. (Defendants' Ex. 4 at COP_BM000241).

79. As Mbegbu was being tased, he was saying "Oh, I'm dying. Oh, my God. I'm dying." (Plaintiffs' Ex. 2 at 30:1-8; 32:17-22). He also said "My eye. My eye." And "I can't breathe. I'm dying." (Plaintiffs' Ex. 1 at 87:23-88:9).

80. Mbegbu was then thrown on the floor "hard" by the Officers, resulting in him hitting his head on the ground and bleeding "all over the floor." (Plaintiffs' Ex. 1 at 65:2-9).

81. As Mbegbu was falling to the ground, his leg caught the table in front of him, causing the table to upend and its contents—including Mbegbu's plate of food and cup of tea—to fall to the ground. (Plaintiffs' Ex. 1 at 77:19-24).

82. After the second taser cycle occurred and Mbegbu was thrown to the floor, he immediately stopped talking and moving. (Plaintiffs' Ex. 1 at 73:12-74:21).

83. At that point, Officer Johnson held him on the floor by his neck by placing a knee to his neck. (Plaintiffs' Ex. 1 at 65:8-12; Plaintiffs' Ex. 2 at 33:9-16; Defendants' Ex. 4 at COP_BM000125).

84. Officer Johnson also applied pressure to Mbegbu's left mandibular angle on his head for three seconds. (Defendants' Ex. 4 at COP_BM000125).

85. Additionally, Officer Weber kept Mbegbu on his back by placing his knees on Mbegbu's back. (Defendants' Ex. 4 at COP_BM000125).

86. Furthermore, Officer Zemaitis bent Mbegbu's legs at the knees and applied pressure to them. (Defendants' Ex. 4 at COP_BM000125; Plaintiffs' Ex. 2 at 33:19-20).

87. While all of these actions were being executed, Mbegbu was not moving, talking, or struggling. (Plaintiffs' Ex. 1 at 73:12-74:21; 87:23-88:1; 89:3-6).

88. The Officers then handcuffed Mbegbu. (Defendants' Ex. 4 at COP_BM000125).

89. The Officers then noticed that Mbegbu appeared to be unconscious. (Defendants' Ex. 4 at COP_BM 000125).

90. Plaintiffs adopt Defendants' account of the events that occurred after the Officers noticed that Mbegbu was unconscious, as set forth in paragraphs 71 through 84 of Defendants' Statement of Facts.

91. At no point during the entire encounter did Ngozi observe her husband do any motions that looked like punching, pushing, "swaying," or hitting the Officers. (Plaintiffs' Ex. 1 at 81:7-23; 86:25-87:2).

92. Ngozi was unsure if Mbegbu kicked any Officers, and Odom stated that any kick to the Officers by Mbegbu was unintentional and happened as a result of him being tased. (Plaintiffs' Ex. 1 at 86:17-24; Plaintiffs' Ex. 2 at 54:23-24; 55:4, 55:19, 55:22-24).

93. Odom recalled that Mbegbu did not struggle with the Officers at all. (Plaintiffs' Ex. 2 at 25:22-26:12).

94. The Medical Examiner, in his Report based on the autopsy findings and other investigative information, including medical records and police reports, concluded that Mbegbu "sustained a cardiac arrest leading to death that occurred in the setting of acute cyclobenzaprine intoxication, multiple medical problems (including atherosclerotic and hypertensive cardiovascular disease, diabetes mellitus, hepatic steatosis, and hypothyroidism), and law enforcement subdual (including a closed fist strike to the face, the use of a conducted electrical device, prone restraint, and handcuff placement), all of which are known risk factors for cardiac arrest." (Defendants' Ex. 9 at COP_BM000281).

95. The Medical Examiner also opined that "the manner of death is undetermined, since the above listed risk factors include natural (multiple medical problems) and non-natural (acute cyclobenzaprine intoxication, law enforcement subdual) processes." (*Id.*).

RESPECTFULLY SUBMITTED this 2nd day of June 2017.

THE MEGWA LAW OFFICE

By /s/ Sabinus A. Megwa
Sabinus A. Megwa
The Megwa Law Office
6811 South Central Avenue
Phoenix, Arizona 85042
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kathleen Wieneke kwieneke@swlfirm.com
Christina Retts cretts@swlfirm.com

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Sabinus A. Megwa