# EXHIBIT "2"

*Gary M. Vilke, M.D., FACEP, FAAEM*
*11279 Breckenridge Way*
*San Diego, California 92131*
*(619) 666-8643*

November 11, 2016

Christina Retts
Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

RE:   Mbegbu, et al. v. City of Phoenix
        U.S. District Court of Arizona Case #: 2:16-cv-00424-DGC

**Introduction**

I am a board-certified emergency physician with substantial experience in sudden cardiac arrest and sudden death, including my service as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science. I am an expert on the topic of restraint physiology, neck holds, TASER electronic control devices (ECDs) and on in-custody cardiac arrest and deaths. I have served on multiple expert and consensus panels and have published multiple peer-reviewed papers and book chapters on these topics. My qualifications are further delineated at the end of my report. I have been retained as an expert to review relevant materials and provide expert opinion on this matter, including the state of the medical and scientific literature, and to consider and render expert opinion on whether the restraining process or the TASER ECD caused or contributed to the death of Mr. Balantine Mbegbu on October 6, 2014. After careful review, it is my opinion to a reasonable degree of medical certainty that neither the restraining process nor the TASER ECD caused or contributed to the death of Mr. Balantine. These opinions and related opinions are set forth in my report.

COP_BM002035

**Materials Reviewed**

I have reviewed extensive materials pertaining to the above referenced case. This includes, but is not limited to:

**Case-Specific Materials**

1. Plaintiffs' Notice of Claim
2. Plaintiffs' Complaint
3. Scheduling Order
4. Defendants' Initial Disclosure Statement
5. Departmental Report
6. Interview of Officer Celina Gonzalez
7. Interview of Officer Matthew Johnson
8. Interview of Officer Peter Kriz
9. Interview of Sabinah Odom
10. Interview of Officer Mesho
11. Interview of Officer Pelke
12. Interview of Sergeant Pagone
13. Interview of Officer Weber
14. Interview of Officer Zemaitis
15. Interview of Chukwumankpa Mbegbu
16. Interview of Ngozi Mbegbu
17. Interview of Geralds Ude-Onyibor
18. Scene Photos taken by CSS McMurray
19. Hospital Photos taken by CSS Tetreault
20. Use of Force Review Board Results
21. Professional Standards Bureau Investigative Memo
22. PSB Transcript of Officer Gonzalez Interview
23. PSB Transcript of Officer Johnson Interview
24. PSB Transcript of Officer Weber Interview
25. PSB Transcript of Officer Zemaitis Interview
26. Unit History Activity Report
27. Call for Service

**COP_BM002036**

- 2 -

28. Medical Examiner's Report

29. Use of Force Policy

30. Training Records for Officer Gonzalez, Officer Weber and Officer Zemaitis

31. Plaintiffs' Initial Disclosure Statement

32. Folder Containing PSB Audio File and Investigative File

33. Folder Containing REDACTED Phoenix Police Photos

34. Public Records Request response

35. Audio of Officer Gonzales' PSB Interview

36. Audio of Officer Joel Zemaitis' PSB Interview

37. Audio of Officer Matthew Johnson's PSB Interview

38. Audio of Officer William Weber's PSB Interview

39. Mbegbu Death Certificate Medical Examiner's Report

40. Toxicology Report

41. John C. Lincoln Medical Records

42. Statement of Funeral Expenses

43. Ambulance Invoice

44. Funeral Program

45. Family Photos

46. Birthday Cards

47. Defendants' First Supplemental Disclosure Statement

48. Phoenix Union High School District educational records for "Buka" Chukwumamkpam Mbegbu

49. Washington High School educational records for "Buka" Chukwumamkpam Mbegbu

50. Department of Economic Security employment records for Ngozi Mbegbu

51. Medical records from Douglas Cunningham, D.O. for Balantine Mbegbu

52. Medical records from Honor Health for Balantine Mbegbu

53. Employment records from the Arizona Department of Corrections for Balantine Mbegbu

54. Maricopa County Medical Examiner records from Balantine Mbegbu

55. Seventy-eight images from the Maricopa County Medical Examiner

56. Fourteen X-rays from the Maricopa County Medical Examiner

57. Eight slides from the Maricopa County Medical Examiner

58. Defendants' First Supplemental Disclosure Statement

59. Arizona Department of Juvenile Corrections Records for Balantine Mbegbu

60. Medical records from John C. Lincoln North Mountain Hospital for Balantine Mbegbu

COP_BM002037

## Medical and Scientific Literature

Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002; 47(2):299-304.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ.  Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the Ventilatory Effects of a Restraint Chair on Human Subjects.. J Emerg Med. 2011;40(6):714-8. Epub 2010 Jan 13.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.  Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

COP_BM002038

Cary NRB, et al: The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol 1998;525:30.

Rossen R, Kabat H, Anderson JP.  Acute arrest of cerebral circulation in man. Arch NeurPsych1943;50(5):510-28.

Iserson K. Strangulation: a review of ligature, manual and postural compression injuries.  Annotated Emerg Med 1984;13:179-185.

Koiwai EK. Deaths allegedly caused by the use of "choke holds" (shime-waza). J Forens Sci 1987;32:419-432.

Koiwai EK. Fatalities associate with judo. Physic and Sports Med 1981;9:61-66.

Kornblum RN. Medical analysis of police choke holds and general neck trauma (part 2) Trauma 1986;28:13-64.

Kornblum RN. Medical analysis of police choke holds and general neck trauma (part 1) Trauma 1986;27:7-60.

Reay DT, Eisele JW. Death from law enforcement neck holds. Am J Forens Med Path 1982;3:253-258.

Tezuka M. Physiological studies of the Ochi (unconsciousness) resulting from shime-waza (strangle-hold) in judo.  Bull Assoc Sci Stud Judo, Kodokan, Tokyo, 1978 Report V:71-73

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Bozeman WP, Hauda WE 2nd, Heck JJ, Graham DD Jr, Martin BP, Winslow JE. Safety and injury profile of conducted electrical weapons used by law enforcement officers against criminal suspects. Ann Emerg Med. 2009 Apr;53(4):480-9. Epub 2009 Jan 21.

Dawes D, Ho J, Miner J. The neuroendocrine effects of the TASER X26: a brief report. Forensic Sci Int. 2009 Jan 10;183(1-3):14-9. Epub 2008 Nov 18.

Eastman AL, et al. Conductive electrical devices: a prospective, population-based study of the medical safety of law enforcement use. J Trauma. 2008 Jun;64(6):1567-72.

Ho JD, Miner JR, Lakireddy DR, Bultman LL, Heegaard WG. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Acad Emerg Med. 2006 Jun;13(6):589-95. Epub 2006 Mar 21.

Strote J, et al. Conducted Electrical Weapon Use by Law Enforcement: An Evaluation of Safety and Injury. J Trauma. 2009 Dec 22. [Epub ahead of print].

Vilke GM, Sloane CM, Suffecool A, Kolkhorst FW, Neuman TS, Castillo EM, Chan TC. Physiologic effects of the TASER after exercise. Acad Emerg Med. 2009 Aug;16(8):704-10.

COP_BM002039

Vilke GM, Sloane C, Levine S, Neuman T, Castillo E, Chan TC. Twelve-lead electrocardiogram monitoring of subjects before and after voluntary exposure to the Taser X26. Am J Emerg Med. 2008 Jan;26(1):1-4.

Vilke GM, Sloane CM, Bouton KD, Kolkhorst FW, Levine SD, Neuman TS, Castillo EM, Chan TC. Physiological effects of a conducted electrical weapon on human subjects. Ann Emerg Med. 2007 Nov;50(5):569-75. Epub 2007 Aug 24.

Ho J, Dawes D, Nelson RS, et al. Acidosis and catecholamine evaluation following simulated law enforcement "use of force" encounters. Acad Emerg Med 2010 Jul;17(7):e60-8.

Vilke GM, Bozeman WP, Chan TC.   Emergency Department Evaluation after Conducted Energy Weapon Use:  Review of the Literature for the Clinician.  J Emerg Med 2011;40(5):598-604. Epub 2011 Jan 4.

Panescu D, Kroll M, Brave M. Cardiac Fibrillation Risks with TASER Conducted Electrical Weapons.  IEEE EMBS 2015; 37:323-329.

## Overview of Opinions
### (all opinions within this report are to a reasonable degree of medical or scientific probability)

An overview of my opinions is as follows with more description of each below:

1.  **The restraining process did not cause the sudden cardiac arrest and death of Mr. Mbegbu.**

2.  **The use of the TASER ECD did not cause the cardiac arrest and death of Mr. Mbegbu.**

3.  **The reported possible neck hold on Mr. Mbegbu did not cause or contribute to his sudden cardiac arrest and death.**

4.  **The fist strike to Mr. Mbegbu's face did not cause or contribute to his death.**

## Analysis

After reviewing the above listed materials, it appears that on October 6, 2014, Phoenix

Police officers were dispatched to a private residence based on the concerns of an anonymous caller

**COP_BM002040**

regarding a verbal argument and possible domestic violence. After arriving at the scene and evaluating the incident, the officers decided to take Mr. Balantine Mbegbu, who was 65 years old, 5'9" tall and weighed approximately 208 pounds at the time, into custody.

The police reports reflect that Mr. Mbegbu was aggressively approaching the officers. Initially the officers tried verbal de-escalation techniques, but this was unsuccessful. When they physically attempted to take him into custody, Mr. Mbegbu resisted. Additional officers were dispatched to the scene to assist. As the officers attempted to gain control of Mr. Mbegbu's arms, he pulled away and resisted. The officers also reported that Mr. Mbegbu was kicking at the officers as well. When one of the officers was kicked in the leg, Officer Johnson delivered a close fist strike with his right hand to Mr. Mbegbu's left face.

They again attempted to gain control of his arms again but were once again unsuccessful. Officer Zemaitis deployed his TASER X2 on Mr. Mbegbu. While the TASER ECD was activated, officer Johnson noted that Mr. Mbegbu appeared to be clenching his arms in front of him. The officers gave Mr. Mbegbu instructions to get on the ground, but he did not comply. About 41 seconds following the first TASER ECD activation, Officer Zemaitis activated his TASER ECD a second time causing Mr. Mbegbu to fall to his stomach on the floor.

Officer Weber had arrived on scene and assisted in handcuffing Mr. Mbegbu. During the brief time to get his hands out from under him and handcuffed, Officer Johnson placed a knee over the back of Mr. Mbegbu's head and neck. Once he was handcuffed, Officer Johnson removed his knee. After being handcuffed, Mr. Mbegbu kept on resisting and trying to roll over, so Officer Johnson used his right thumb to apply a pressure point control for approximately three seconds to the rear of Mr. Mbegbu's left mandibular angle. Officer Weber was trying to keep him from rolling over by placing a knee on Mr. Mbegbu's back. Officer Zemaitis bent Mr. Mbegbu's legs at the knees and applied pressure to stop him from turning. At this point, a RIPP restraint was requested.

The officers soon after noted Mr. Mbegbu stopped moving and appeared unconscious.

COP_BM002041

Officer Zemaitis palpated that a carotid pulse was present.  The officers also noted that he appeared to be breathing. EMS was dispatched to respond to evaluate Mr. Mbegbu as being unconscious. Shortly thereafter, the officers could not confirm a pulse and Mr. Mbegbu had the handcuffs removed, was rolled over and CPR was started.

Paramedics arrived to find CPR being administered and when they put Mr. Mbegbu on the monitor, they found an initial cardiac rhythm of asystole, flat line.  Advanced cardiac care was given, but ultimately, he could not be resuscitated and was pronounced dead at the hospital at 2212. The medical examiner who performed an autopsy reported the cause of death to be, "Cardiac arrest in the setting of acute cyclobenzaprine intoxication, multiple medical problems, and law enforcement subdual."

Given this history, there are a number of issues that need to be addressed in more detail below.  All opinions given are to a reasonable, or higher, degree of medical probability based on the information currently available.

### Detailed discussion and basis of opinions

### 1. *The restraining process did not cause the sudden cardiac arrest and death of Mr. Mbegbu.*

During the period that Mr. Mbegbu was being handcuffed, he was restrained in a position on his stomach with some weight placed on him initially to gain control over him.  After Mr. Mbegbu was cuffed he was reported to continue kicking and resisting.  In fact, a RIPP restraint was requested because he kept resisting and trying to roll over.  He was making noises, breathing and struggling and without any reported evidence of respiratory or ventilatory difficulty during this time.  He was not reported to complain of shortness of breath or difficulty breathing after being restrained.

The timeline based on records available noted that Officer Zemaitis arrived at 2120.  At 2121, Mr. Mbegbu was reported to be in custody.  This timing is consistent with the 90 second

**COP_BM002042**

estimated time by Officer Zemaitis that it took to get him into custody.  At approximately 2124, the fire department was requested due to Mr. Mbegbu being unconscious and at 2129, there was a request to expedite EMS because it appeared that Mr. Mbegbu was no longer breathing.  Thus the actual time of struggle to get the handcuffs was not long enough to cause asphyxiation in and of itself.

The majority of the weight force was not even on Mr. Mbegbu in such a position that would have created the potential to limit ventilation.  The minimal weight placed on the upper torso while cuffing would not significantly limit ventilations enough to cause asphyxiation.  After the cuffing, Mr. Mbegbu was trying to roll over, so Officer Weber placed a knee onto his back to keep him from rolling over.  Officer Zemaitis bent Mr. Mbegbu's legs at the knees and applied pressure to keep him from moving.  This pressure on the legs would not have any impact on ventilations.  Research using up to 220 lbs. of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight.

Given that Mr. Mbegbu was alive and resisting before, during, and after the hand-cuffing, and that the cardiac arrest occurred suddenly later in time with only a minimal amount of weight being placed for a short time period, the effort to restrain and handcuff him did not cause asphyxia.  There is no evidence that position, restraint or body weight caused or contributed to Mr. Mbegbu's death.

## 2. *The use of the TASER ECD did not cause the cardiac arrest and death of Mr. Mbegbu.*

There is a great deal of unwarranted concern of electrocution based on lay misunderstanding of the reported 50,000 volts (V) peak open arcing voltage used by TASER handheld ECDs. TASER handheld ECDs deliver only a fraction of the open arcing 50,000 V to the body. However, it is not the voltage, but the delivered electrical charge (amperage), that actually creates a theoretical risk for cardiac effects. For example, the static electricity from walking across a carpet can generate 30,000

COP_BM002043

to 100,000 V.   The amount of delivered electrical energy able to be transferred to a person is limited as the TASER X2 ECD is only powered by a small battery pack, not an electrical outlet or power generator.

It is the TASER ECD's rapid cycling that can cause the subjects' muscles to contract at about 19 times a second that offers the effective incapacitation of the subject in probe mode, or painful compliance in drive-stun mode, while still offering a significant safety margin from electrical injury.   Once the energy from an ECD is turned off, the subject is back to his physical baseline and can fight, struggle or move immediately.

There are no peer-reviewed published scientific or medical literature studies that conclusively demonstrate that TASER ECDs cause cardiac dysrhythmias or cardiac arrest in humans.   More than 1.5 million volunteer subjects have undergone TASER ECD activations, and none have ever been reported to develop sudden cardiac arrest or die.   Just because a TASER ECD was being used in some temporal proximity to a subject's death does not imply causation.

The police report noted two trigger pulls with the total time from the trigger pulls was 17 seconds of activation time, including a 11-second activation, followed by a 6-second activation approximately 41 seconds later.   Both of these activations were reported to be from a single probe mode deployment by Officer Zemaitis.   The first was in probe mode and the second use was with the TASER device being placed into contact to form an arc for better conduction.   As noted previously, in order for an ECD to deliver a charge to the person, the electrical circuit must be completed and maintained.   Thus, as a point of clarification, just because the TASER ECD download recorded 17 seconds of activation time from the TASER ECD does not mean that the TASER ECD was indeed in contact with Mr. Mbegbu and delivering the electrical stimulus for that amount of time.   Often with a subject who is struggling, running, squirming and moving, there will be disruption with the contact points of the TASER ECD.

COP_BM002044

I will base my opinions on a "worst" case scenario assuming all 17 seconds of trigger pulls were applied to Mr. Mbegbu.  However, as noted previously, in order for an ECD to deliver a charge to the person the electrical circuit must be completed and maintained.  If the TASER ECDs had "electrocuted" Mr. Mbegbu, his heart would have gone into a ventricular fibrillation (VF) at the time the electricity was being delivered and he would have immediately lost consciousness at the time that the TASER ECD was firing or within 1-2 seconds after stopping.  Subjects in VF cannot fight or struggle, let alone remain conscious, as the blood flow to the brain ceases immediately.

This time of struggle that Mr. Mbegbu had after the last TASER ECD activation supports that the TASER ECD did not cause the heart to go into cardiac arrest.  He was struggling so much that a RIPP restraint was requested to help control his legs.  This conclusion that the TASER ECD did not cause the cardiac arrest is also supported in that the first rhythm reported by the paramedics who attended to Mr. Mbegbu after he went into cardiac arrest was asystole, flatline.  Asystole is not a rhythm caused by electrocution, VF is.

In order for one to possibly conclude that a TASER ECD could even be considered to cause cardiac arrest, all of the following facts would need to be present:

1) The device probes would need to be penetrating deep into the chest wall for the tips to be close to the heart (a close dart to heart ratio);

2) The subject would need to have a thin chest wall;

3) The subject would need to be standing at the time of the TASER ECD activation and leaning forward so that the heart is closer to the anterior chest wall;

4) The subject would need to lose consciousness immediately during the TASER ECD activation or with 1-2 seconds after; and

5) The first cardiac rhythm would need to be ventricular fibrillation.

All of these would be needed to even consider the TASER ECD as the cause of death, but in this case with Mr. Mbegbu, the majority of these facts are not present.  In summary, all of the

**COP_BM002045**

published scientific data as well as the objective evidence available in this case confirms that the use of the TASER ECD was non-contributory to the cardiac arrest and death of Mr. Mbegbu.

### 3. *The reported possible neck hold on Mr. Mbegbu did not cause or contribute to his sudden cardiac arrest and death.*

In the Notice of Claim, the plaintiffs report that "While Balantine was still on the ground, it appeared that one of the Police Officers may have placed his forearm on the front of Balantine's neck in a choke hold depriving him of oxygen."

By way of background, the pathophysiology and safety, of the lateral vascular neck restraint (LVNR), also known as a carotid restraint, are relatively straightforward and well delineated in many texts. This is the neck hold that is typically used by law enforcement when a neck hold is needed. The purpose is to place the arm around the neck of the subject to be controlled. The crook of the elbow is placed at the anterior (front) region of the neck and the forearm and upper arm come around the sides and are used to place pressure on the lateral aspects of the neck where the carotid arteries are located. Pressure placed on these arteries diminishes blood flow to the brain, quickly rendering the subject unconscious. This hold is considered safe and has been used in judo and other forms of martial arts for centuries.

In this case, there was no evidence of even an attempted neck hold. None of the police reports reflect that a neck hold was used. Even the Notice of Claim was vague in noting that the hold "may" have been placed. Mr. Mbegbu never lost consciousness during the attempt to get him handcuffed, so a successful neck hold was obviously not placed. Additionally, the findings in the autopsy report support that there was no neck hold even attempted as the hyoid bone was intact as were the tracheal and laryngeal cartilages. Additionally, there was no soft tissue injury reported of the neck muscles. Even if there had been a neck hold placed during the time of the handcuffing, it was not successful and did not cause any injuries that would have caused or contributed to the cardiac arrest and death of Mr. Mbegbu.

**COP_BM002046**

4.   *The fist strike to Mr. Mbegbu's face did not cause or contribute to his death.*

During the altercation, Mr. Mbegbu sustained an injury to his face.    The police report noted that Officer Johnson delivered a closed fist strike to the left side of Mr. Mbegu's face. A review of the emergency department record describes some left periorbital edema extending to the left side of the forehead.  This is consistent with the medical examiner finding of a two-inch span of subcutaneous swelling centered on the left lower eyelid and in the center having a ¼ inch superficial laceration.  Basically this is a small bruise with a tiny superficial break in the skin in the middle. This injury is consistent with minor blunt trauma as reported by the officer.

Additionally, and more importantly, there were no abnormal intracranial findings on the autopsy report that indicated that this fist strike had any contributing effects to Mr. Mbegbu's death. The brain and associated structures were all normal.  Based on the autopsy findings and his clinical presentation, the blunt injury did not cause or contribute to Mr. Mbegbu's cardiac arrest and death.

## Background

My background is that I am a full time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine.  I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the clinical operations chief for our two emergency departments with a combined annual census of approximately 80,000 visits.  I currently serve as the Medical Director for Risk Management for the UC San Diego Health System.  I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and

**COP_BM002047**

making determinations of standard of care. I am also the former Chief of Staff for the UCSD Medical Center.

I have worked for over 20 years as a faculty emergency physician at an urban-based emergency department that is contracted to receive patients who in custody, both as field arrests and for on-going care while incarcerated.  I served as the UCSD Director of Custody Services overseeing hospital services for the San Diego County Sheriff's Department Medical Services for 16 years.  I also have worked in a jail setting for over 18 years, staffing weekly sick call clinics on site at the San Diego Sheriff's jails throughout San Diego County.  I have also served as the on-site medical director for the San Diego Sheriff's medical clinics for 16 years where I have trained staff physicians, participated in quality assurance, resource utilization, policy and protocol development and peer review.  I have also overseen the physician staffing for seven jails in San Diego County over that time.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department and have personally been restrained with weights placed on me as well.  I have been invited to lecture nationally and internationally on this subject.  Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in custody death.

I am knowledgeable of peer-reviewed medical and scientific research on TASER electronic control devices (ECDs) conducted by others.  In fact, I was the lead author on work requested by the American Academy of Emergency Medicine (AAEM) to review the totality of the peer reviewed published medical literature on humans and come to conclusions regarding the necessary

COP_BM002048

emergency department evaluation of patients being seen after receiving a TASER ECD activation. I have received federal grant funding and performed extensive clinical research on human subjects who have received TASER ECD applications (articles included in my curriculum vitae) which includes having been involved with over 200 TASER ECD activations and have personally received multiple applications of the device. I have written several book chapters on this topic and have lectured internationally about the physiologic effects of TASER ECDs.

I am knowledgeable of peer-reviewed medical and scientific research on neck holds. I have written several peer reviewed papers and textbook chapters on this topic and have been invited to lecture on this topic. I am trained as a second-degree black belt in tae kwon do and have been trained in neck holds and have even been personally "choked out" to the point of unconsciousness. Given my own interests in this area, I regularly perform a complete review of the literature regarding neck restraint use.

I am knowledgeable of peer-reviewed medical and scientific research for cardiac arrest and CPR practices. I was the Principle Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study for ten years that involved over 200,000 cardiac arrest patients to evaluate treatment options for out of-hospital cardiac arrest and severe traumatic injury. I have published many peer-reviewed papers on the topic of cardiac arrest and cardiac resuscitation. I also serve as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science since 2007, teaching Advanced Cardiac Life Support (ACLS) both locally and being asked to give lectures on cardiac arrest internationally. I have been an ACLS instructor for over 20 years. I also work at a busy urban comprehensive emergency department where I care for patients in cardiac arrest on a regular basis.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me. Appendix B is a list of all cases in which I have

COP_BM002049

testified as an expert in trial or deposition within the preceding four years.  Appendix C is my fee

schedule.   The knowledge base that I utilize has been developed over time from my years of

clinical practice and experience, reading and training as well as research.  Under penalty of perjury,

I hereby swear that the opinions stated above are true and correct within a reasonable degree of

medical probability.


Respectfully submitted,


Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Emergency Medicine Clinical Service Chief and Co-Medical Director
Medical Director, Risk Management, UC San Diego Health
Director, Clinical Research for Emergency Medicine

COP_BM002050