# EXHIBIT 4

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF ARIZONA

3      _____

4   Yolanda Erickson, individually,  )
    and as a personal representative )
5   of the Estate of Miguel Ruiz,    )    CV-14-01942-PHX-JAT
    Canon Ruiz and minor A.R.,       )
6                                    )
                Plaintiffs,          )
7        vs.                         )    Phoenix, Arizona
                                     )    May 3, 2017
8   City of Phoenix, et al.,         )       9:01 a.m.
                                     )
9                Defendants.         )
    _____)

10

          BEFORE:  THE HONORABLE JAMES A. TEILBORG, JUDGE
11           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                  TRIAL DAY 7 - A.M. SESSION
12  APPEARANCES:

13  For the Plaintiffs:
              BLACKWELL LAW OFFICE, PLLC
14            By:  Jocquese L. Blackwell, Esq.
                   Gillmore B. Bernard, Esq. (Not present)
15            420 West Roosevelt Street, Suite 106
              Phoenix, AZ  85003
16
    For the Defendants:
17            JONES, SKELTON & HOCHULI, PLC
              By: John T. Masterson, Esq.
18                Joseph J. Popolizio, Esq.
              40 N. Central Ave., Ste. 2700
19            Phoenix, AZ  85004

20  Official Court Reporter:
    Elva Cruz-Lauer, RMR, CRR
21  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc. 33
22  Phoenix, Arizona  85003-2151
    (602) 322-7261

23
    Proceedings Reported by Stenographic Court Reporter
24  Transcript Prepared by Computer-Aided Transcription

25

1                    P R O C E E D I N G S

2              (Called to the order of court at 9:01 a.m.)

3              THE COURT:  The record will reflect the presence of

4    the parties, counsel, ladies and gentlemen of the jury.

5              You may call your next witness.

6              MR. MASTERSON:  Thank you, Judge.  We are calling

7    Dr. Charles Wetli.

8              THE COURT:  Thank you.

9          CHARLES WETLI, M.D., DEFENDANT'S WITNESS, SWORN

10             THE WITNESS:  I am Dr. Charles Wetli, C-H-A-R-L-E-S,

11   W-E-T-L-I.

12             THE COURT:  You may proceed.

13             MR. MASTERSON:  Thank you, Judge.

14                       DIRECT EXAMINATION

15   BY MR. MASTERSON:

16   Q.  Good morning, Dr. Wetli.

17   A.  Good morning.

18   Q.  Just a little introduction.  Could you tell the jury who

19   you are and what you currently do for a living?

20   A.  I am Dr. Charles Wetli.  I am a forensic pathologist.

21   Q.  How long have you been a forensic pathologist?

22   A.  Since September of 1977.

23   Q.  Are you a board-certified forensic pathologist?

24   A.  Yes, I am certified by the American Board of Pathology in

25   anatomical, clinical and forensic pathology.

1    Q.  What exactly does that mean?

2    A.  To be certified in anatomical and clinical pathology means

3    that you have taken training in an approved residency program

4    and you have passed an examination that says that you are

5    competent in those areas.

6          In subspecialties, such as forensic pathology, it

7    means that you have taken training in a specific program for

8    that specialty and you have passed that examination based upon

9    what an expert in the field should know.

10   Q.  Okay.  Now, some of us may have heard on TV, some of us

11   maybe not, can you explain generally what a forensic

12   pathologist is and what a forensic pathologist does?

13   A.  Correct.  Forensic pathology basically is the investigation

14   of -- medicolegal investigation of death, which translated

15   means, the investigation of any death that occurs suddenly and

16   unexpectedly while the person is apparently in good health.

17         Any time there's a suspicion for an unnatural death,

18   any time there's a suspicion for a threat to public health,

19   such as anthrax or smallpox, for example.

20   Q.  Let's just go a little bit through your educational history

21   and your past work history for the jury so they understand a

22   little bit about you.  Why don't you just tell us generally --

23   well, let's start with where you went to school and then where

24   you went to medical school, et cetera.

25   A.  Okay.  I received a bachelor of science degree from the

1    University of Notre Dame, and subsequently I went to the St.

2    Louis University School of Medicine in St. Louis, Missouri,

3    where I obtained my doctor of medicine degree in 1969.

4            Following that, I went to the University of Miami

5    School of Medicine in Miami, Florida for internship and

6    residency in anatomical and clinical pathology.

7            Following that, I worked for a very brief period of

8    time at the Dade County, Florida Medical Examiner's Office,

9    which is in the greater Miami area, and spent three years in an

10   overseas command in the United States Army as basically an

11   anatomic and forensic pathologist.

12           After the Army, I did one year of private practice in

13   pathology at a hospital in Miami, then decided to go into

14   forensic pathology full-time.  I completed a fellowship

15   training at the Dade County Medical Examiner's Office and

16   became the deputy chief medical examiner for Dade County

17   Florida and remained in that position for the next 17 years.

18           In February of 1995, I assumed a chief medical

19   examiner position in Suffolk County, New York, and I was also

20   in charge, at that time, also responsible for the crime

21   laboratory and the toxicology laboratory for the county.

22           I remained in that position until August of 2006 when

23   I retired, and since then I have been doing simply consulting

24   work in the area of forensic pathology.

25           While in Miami, I was also an associate professor --

1    sorry, an associate clinical professor of pathology at the

2    University of Miami School of Medicine, and when I was in New

3    York, I was a clinical professor of pathology at the State

4    University of New York at Stony Brook.

5    Q.  Now, when you say you retired and became a consultant, what

6    do you mean by "consultant"?

7    A.  Basically, I will get a call from an attorney who will say,

8    I have a case of a particular concern, it could be a cause of

9    death issue, could be -- was there any pain and suffering?  It

10   could be a variety of issues that involve the area of forensic

11   pathology.  It could be interpretation of wound patterns, for

12   example, that type of thing.

13          And then I will review the materials and then offer an

14   opinion as to my thoughts on a particular case.  If necessary,

15   I will generate a report and testify in a deposition or in

16   court, if necessary.

17   Q.  Do you work on behalf of police officers a lot?

18   A.  Not a lot.  I do -- I do quite a few deaths -- quite a few

19   cases of deaths in police custody and arrest-related deaths for

20   a variety of reasons, but a lot of it has to do with the work I

21   have done in the past concerning drug abuse, particularly,

22   stimulant drugs such as methamphetamine, cocaine, and so forth.

23   Q.  Can you divide up your consulting work?  I mean --

24   A.  Well --

25   Q.  To help the jury understand, I mean, do you do all

1  poster presentation, meaning you have your entire presentation

2  on a large poster board in a room and with a number of other

3  people doing the same type of thing.  These are all

4  peer-reviewed presentations.

5  Q.  Now, have you ever given any government testimony or been

6  called to testify before Congress?

7  A.  Yes.

8  Q.  Why did you testify before Congress?

9  A.  Mostly my testimony before Congress had to deal with issues

10  of drug abuse, specifically, quaaludes, couple of times on

11  cocaine, especially at a time when it was thought that cocaine

12  was a benign, safe drug that nobody ever died from.  And I was

13  saying, no, people do die from cocaine use and so forth.  So I

14  was involved in congressional hearings in that regard.  Also

15  hearings at state and local government as well, usually, again,

16  on topics of drug abuse.

17  Q.  Now, with respect to the United States Congress, do you

18  know how is it that works?  Does a senator or Congressman or

19  somebody say, hey, we need a guy, and how do we get this guy?

20  How does that work?

21  A.  Usually somehow or another a senator is in charge -- or

22  Congressman or Congresswoman is in charge of a particular

23  investigative committee and they will hold hearings, and then

24  they get information based upon those hearings.  And, for

25  example, the one on cocaine, apparently there was testimony

1   saying, well, there is some evidence -- there's a growing body

2   of evidence that cocaine is not, in fact, a safe recreational

3   drug and we should really look twice before we consider

4   legislation about legalizing it.

5          And then the inquiry goes on, well, who was saying

6   that the cocaine is dangerous?  And then my name came up, and

7   so I wound up testifying before the committee.

8   Q.  Okay.  Are you a published author, sir?

9   A.  Yes.

10  Q.  Now, I wrote down 125 publications, is that fairly close?

11  A.  Yes.

12  Q.  Are there any of those publications that you have written

13  or -- I don't know if the articles or books or what exactly

14  they are, but do they pertain -- do any of them pertain to

15  maybe issues that are relevant to this particular case?

16  A.  Yes.

17  Q.  And can you identify one, two, three, or however many?

18  A.  Well, there are two books, one called Practical Forensic

19  Pathology, and another an Atlas of Forensic Pathology that

20  touches on aspects of drug abuse and deaths in custody and

21  arrest-related deaths.

22         Otherwise, there are individual peer-reviewed articles

23  that appeared in various journals, specifically dealing with

24  excited delirium, and a number of these, first one, I believe,

25  was in 1985 or thereabouts.  Actually, the first, I think, was

1    actually about 1982, and then a subsequent article better

2    defining it in recreational drug users.  I think it was in

3    1985, and since then I have written a number of articles and so

4    forth, including chapters in an encyclopedia concerning the

5    investigation of these deaths.

6    Q.  Now, yesterday we heard a little testimony about excited

7    delirium -- well, Mr. Blackwell was asking some questions of

8    another witness and we heard about a -- I don't know if it was

9    a Dr. Bell or Mr. Bell, that sometime in the 1840s was talking

10   about excited delirium.  Have you heard that?

11   A.  Dr. Luther Bell.  It was in 1849.  Dr. Luther Bell was a

12   psychiatrist in New York and he saw a cohort of individuals who

13   were mentally normal then had a sudden psychotic break and they

14   became violent.  They had a tremendous amount of difficulty

15   restraining these individuals.  They had high core body

16   temperatures, and they suddenly died.

17          And autopsies on these individuals invariably were

18   negative and they just weren't aware of what was going on.

19   They did not use the term "excited delirium" at that time.  The

20   term most commonly used was acute exhaustive mania.  Although

21   there's other terms for it called psychotic fourers was one,

22   and then finally over the years it became just simply known as

23   Bell's mania, and that's pretty much the term that was used up

24   until the late 1970's.

25   Q.  And what happened of note in the late 1970's?

1          THE COURT:  Overruled.

2     A.   Yes, general research interest as a forensic pathologist

3     has always been areas of drug abuse, and excited delirium

4     became part of that.  So, yes, I became interested in excited

5     delirium as a result.

6     BY MR. MASTERSON:

7     Q.   Did you conduct studies in that area?

8     A.   Yes.

9     Q.   Well, tell the jury a little bit about what you did.

10    A.   Well, after the initial publication with the psychiatrist,

11    I began seeing cases in the Miami area that looked to me to be

12    exactly the same thing of excited delirium.  They all had

13    similar features.  All of them dying while the police were

14    trying to arrest these individuals.

15         Autopsies were generally negative.  They all had low

16    levels of cocaine.  So I went back to the psychiatrist and

17    said, these look to me like cases of excited delirium, and he

18    agreed.  And then we published the series, I believe it was of

19    seven cases from south Florida about these cases of excited

20    delirium.

21         In the meantime, similar cases were appearing in

22    California related to methamphetamine use.  And then over the

23    years we began to see more and more of these cases throughout

24    the country, generally associated with the abuse of stimulant

25    drugs, such as cocaine and methamphetamine, also hallucinogenic

1   drugs, such as phencyclidine and LSD.

2          Also during -- over the years, toxicology improved.

3   We began to see a lot more, as far as the typical laboratory

4   results of the drug levels that we would see and so forth of

5   these individuals and began to see a lot more similarities once

6   they were admitted to the hospital, if they could be

7   resuscitated and so forth.  So over the years we have learned a

8   lot more about this syndrome.

9   Q.  Now, you mention that some of this was occurring in -- or

10  some of these deaths were occurring in Miami, Florida.

11  A.  Correct.

12  Q.  That's Dade County?

13  A.  Correct.

14  Q.  That reminded me, yesterday Mr. Blackwell asked a question

15  of another doctor and said something about an incorrect finding

16  on the death of 17 women in Dade County, do you know anything

17  about that?

18  A.  Yes.

19  Q.  What's that all about?

20  A.  For a period of time, about one and a half to two years, we

21  were seeing occasional deaths of black females who died during

22  sexual activity.  They all had negative autopsies, meaning

23  there was no obvious disease process or injury that killed

24  them, and they all had low levels of cocaine in their blood,

25  and we had absolutely no idea what was going on.

1    anything else because, for example, if there's a victim or

2    skeletal remains that occurred while he was in prison, that

3    case is eliminated.  So it was not a very scientific study to

4    begin with.  And basically, he said that it was homicide by

5    undetermined means and reclassified the death certificates as

6    such.

7    Q.  When he said homicide by undetermined means, was he in

8    effect blaming this individual who was out of jail during

9    certain periods of time?

10   A.  That's kind of the implication of it.  Again, it was

11   nothing that would stand up to any kind of scrutiny because of

12   the way the study was done.  The qualification was you were a

13   black female who was found dead while this particular guy was

14   out of jail.  If he was in jail at the time, you were

15   eliminated from the series.

16   Q.  Did anybody specifically find that any of your medical

17   determinations as a medical examiner were false?

18   A.  No.

19   Q.  As a medical examiner, you perform autopsies, correct?

20   A.  Correct.

21   Q.  How many autopsies have you performed up until now?

22   A.  Personally, I performed 7,456.

23   Q.  All right.  I want to move to this particular case.  I

24   think you have your report up there.  Take a look at it, if you

25   need to and refresh your memory.  It is Exhibit 112.  First

1                          C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7   a full, true, and accurate transcript of all of that portion of

8   the proceedings contained herein, had in the above-entitled

9   cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 5th day of May, 2017.

12

13                              _____
                                       s/Elva Cruz-Lauer
14                              Elva Cruz-Lauer, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25